THE COURT
 

 The Superior Court of Sacramento County, sitting as a juvenile court, has adjudged the two minors, Timateo (Timothy) and Frances Raya, nine and seven years of age, respectively, to be dependent children within the meaning of Welfare and Institutions Code, section 600, subdivision (a).
 
 [1]
 
 Five court orders are involved. Their net effect was to remove said children from the custody of both their parents; Henrietta Raya, the mother (who prior to the first of such orders had had the children in her custody) and Isidro Raya, the father. Under the latest of said orders the children were placed in the Sacramento Receiving Home “pending suitable placement by the Sacramento County
 
 *258
 
 Welfare Department.” The orders are appealable and have priority on appeal. (Welf.
 
 &
 
 Inst. Code, § 800.) They were appealed both by the father and the mother. Appearing on behalf of the children, the public defender has filed a brief supporting the parents’ appeals. On September 20, 1967, we issued a temporary stay of execution and placed the children in the custody of their mother. The appeals have been argued.
 

 Basic facts are that in the course of the hearing of a divorce action it developed that the couple, separated, were each presently cohabiting with partners of the opposite sex under a consensual extramarital, but long lasting, arrangement; that Mrs. Baya and her consort, William Mendoza, have had four children out of wedlock while Mr. Baya and his mistress, a Miss Fernandez, have had three children. Miss Fernandez, unmarried, also had had a child before the BayaFernandez liaison.
 

 Mr. and Mrs. Baya separated in 1960. They have not lived together since. At the time of the separation Mrs. Baya took the two children with her and they have been with her until the court orders described.
 

 As soon as Baya and Miss Fernandez commenced living together a divorce was contemplated but at the time Baya lacked funds to pay the legal expense. (Both families have been on relief sporadically. The Department of Social Welfare has known of the extramarital status of the two couples.) On February 7, 1967, Baya filed a divorce action; this through the Sacramento Legal Aid Society, whose policy to give financial assistance in proper domestic relations matters for the benefit of parties with substandard financial means is recent. The purpose here was to effect a change in the relationship of both couples, who have expressed an intent to marry as soon as this may legally be accomplished. (The report of the probation officer hereinafter mentioned credits the sincerity of this intent.) The Baya divorce will be final in February 1968. Mr. Baya’s divorce complaint alleges Mrs. Baya to be a fit and proper person to have custody of the children.
 

 During the pendency of the divorce a probation report was ordered. The report, dated April 38, 1967, includes these facts: The Mendoza-Baya family resides in a three-bedroom home in a low rent district. The home is being purchased by .the couple. It is described as “neat, clean, and quite comfortable . . . and furnished with all necessary facilities.”
 
 *259
 
 The children lived in the Baya-Mendoza household and accepted Mr. Mendoza as their father and he was a father to them. The Bayas separated when the children were very young and since that time they had had little or no contact with their natural father. When they subsequently learned that their natural father was Baya, they became quite disturbed. The report states the children appear well cared for and Baya concedes that Mrs. Baya has been a good mother who gives the children good parental care. The Mendoza-Baya home is one block from the school which the children attend. Their school attendance record is good and they are doing exceptionally well in school. The report’s appraisal in this regard is: “These children appear to be happy, healthy, normal youngsters and well eared for . . . bright, friendly. ’ ’ The entire family, of the Catholic faith, attend church each Sunday.
 

 Baya has contributed something to the support of the children but has also been before the Domestic Belations Division of the Sacramento County District Attorney’s office for some remissness in this regard. The report’s evaluation and recommendation includes: “Your officer is of the opinion that the mother of Timothy and Francis Bay
 
 [sic]
 
 is a person of good moral character and that she is properly caring for said minors and, too, is seeing that they receive an education as well as spiritual training, and your officer feels that inasmuch as we do have children here of tender age who are in need of maternal love, care, guidance, training, discipline and education, it is to their best interests and welfare that they continue in the custody of their mother. . . . [with] an opportunity to visit with their natural father and to become better acquainted with him. ’ ’
 

 The
 
 fads
 
 in this report apparently have been accepted by the trial court; but its
 
 conclusions
 
 were not. In fact, a minute order of March 21, 1967 (before the date of the report) reads: “Court finds both parents unfit. Befer to Juvenile Court under 600 A W & I Code. To be heard in Dept 6 sitting as Juvenile Court.” The matter was again referred to the county probation office, which thereafter filed petitions alleging the two Baya children were minors described in section 600, subdivision (a), of the Welfare and Institutions Code (see fn. 1). A hearing was held on the petition on June 23, 1967. Attorneys representing both parents were present, also Public Defender Kenneth Wells, who had been assigned by the court to represent the minors. A
 
 *260
 
 new probation report was then heard. Its factual determinations were substantially as stated above. Its recommendation, however, was that which later became the court’s order. Testimony was also given by Raya, Mrs. Raya, and their respective intended spouses. Their testimony did not substantially differ from the facts in the reports.
 

 Separate orders covering each minor have been made. Two orders were made on June 23, 1967. They declared the children to be dependent children under section 600, subdivision (a). The first (in each ease) committed them to the joint supervision of the probation officer and county welfare department. Modified orders the same day changed the custody of the children to their maternal grandmother. Those orders were in turn modified three months later, on September 20, 1967. (The court at that time had learned the maternal grandmother was living with her “husband” out of wedlock.) The last order removed the children from the grandmother’s custody and placed them, as stated above, in the receiving home.
 

 The trial court found, utilizing the language of section 600, subdivision (a), that the children had “no parent or guardian actually exercising proper and effective care and control and continue [s] to be in need of such care and control,” in that each of the natural parents had lived in unmarried cohabitation for more than the five preceding years. This finding cannot be disturbed on appeal if there is substantial evidence to support it.
 
 (In re Macidon,
 
 240 Cal.App.2d 600, 607 [49 Cal.Rptr.
 
 861]; In re Corrigan,
 
 134 Cal.App.2d 751, 754-755 [286 P.2d 32].) The evidence before the court supplied no substantial support for the finding.
 

 In wardship proceedings the welfare of the child is the paramount concern.
 
 (In re Farley,
 
 162 Cal.App.2d 474, 478 [328 P.2d
 
 230]; In re Corrigan, supra,
 
 134 Cal.App.2d at p. 754.) Section 600, subdivision (a), of the Welfare and Institutions Code permits an adjudication of wardship when proper and effective parental care or control is lacking. The phrase “proper and effective” offers at best a dim light to discern the point at which a juvenile court is authorized to invade and supplant a parent-child relationship. In one sense the phrase expresses an objective identical with the judicially expressed goal of the child’s welfare. In another sense it connotes parental fitness or unfitness. (See
 
 Marr
 
 v.
 
 Superior Court,
 
 114 Cal.App.2d 527, 530 [250 P.2d 739].) Additional
 
 *261
 
 coloration may be gained from the notion of the “neglected child, ’ ’ whose home environment exposes him to physical or moral detriment.
 
 [2]
 

 However this may be, the statutory criterion of improper and ineffective parental care denotes a fairly extreme case. A dominant parental right to custody of the child pervades our law. (See Prob. Code, § 1407; Civ. Code, § 197;
 
 Roche
 
 v.
 
 Roche,
 
 25 Cal.2d 141, 143-144 [152 P.2d 999];
 
 Stever
 
 v.
 
 Stever,
 
 6 Cal.2d 166, 168-170 [56 P.2d.l229] ;
 
 In re Campbell,
 
 130 Cal. 380, 382 [62 P. 613]; 2 Armstrong, Cal. Family Law, pp. 993-1018.) Although expressed more often in divorce and guardianship cases, the dominating right of a parent to custody of his child plays a role in the interpretation of section 600, subdivision (a). Many homes, however blessed by marital vows, fall short of an ideal environment for children. It may be safely assumed that the Juvenile Court Law was not intended to expose such homes to wholesale intervention by public authorities. “It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.”
 
 (Prince
 
 v.
 
 Massachusetts,
 
 321 U.S. 158, 166 [88 L.Ed. 645, 652, 64 S.Ct. 438] quoted in
 
 Roche
 
 v.
 
 Roche, supra,
 
 25 Cal.2d at p. 144.) Thus before section 600, subdivision (a), authorizes the drastic step of judicial intervention, some threshhold level of deficiency is demanded. Although a home environment may appear deficient when measured by dominant socioeconomic standards, interposition by the powerful arm of the public authorities may lead to worse alternatives.
 
 [3]
 
 A juvenile court may possess no magic wand to create a replacement for a home which falls short of ideal.
 
 [4]
 
 California appellate decisions in wardship cases of the “dependent child” variety demonstrate rather extreme eases of neglect, cruelty or continuing exposure to immorality. (See
 
 In re Farley, supra,
 
 162 Cal.App.2d 474;
 
 In re Schubert,
 
 153 Cal.App.2d 138 [313 P.2d 968];
 
 In re Corrigan, supra,
 
 134 Cal.App.2d 751;
 
 Marr
 
 v.
 
 Superior Court, supra,
 
 
 *262
 
 114 Cal.App.2d 527;
 
 In re Halamuda, 85
 
 Cal.App.2d 219 [192 P.2d 781] ;
 
 In re Schultz,
 
 99 Cal.App.134 [277 P. 1049];
 
 Ex parte Hunter,
 
 45 Cal.App. 505 [188 P. 63].)
 

 When section 600, subdivision (a), is so viewed, the present facts fall short of that level of improper and ineffective control which might justify an adjudication of public wardship. Nonconflicting evidence demonstrated that the children were happy, healthy and well adjusted in the home provided by their mother and Mr.
 
 Mendoza;
 
 that the mother and Mr. Mendoza were satisfying the children’s need for familial love, security and physical well-being. The fact that the mother had established a home and was living with a man to whom she was not married supplied the sole evidence which might conceivably support the finding. This piece of evidence was inextricably coupled with a group of accompanying circumstances: (1) the relationship was stable, not casual or promiscuous; (2) poverty alone had prevented the Rayas’ divorce and the mother’s marriage to Mr. Mendoza; (3) as soon as poverty ceased to be a barrier—that is, shortly after the Sacramento Legal Aid Society broadened its program to provide legal counsel in such cases—a divorce was instituted, which would legitimize the Rayas’ relationships and permit them to establish homes according to prevailing norms. The juvenile court did not face a situation in which the natural parent had surrendered to unmarried cohabitation as her permanent condition, nor need we consider such a case. Given time and freedom from outside interference, the Mendoza-Raya household was in process of transformation into an established family unit. If the wardship order did not block that process, it at least disrupted it and inflicted upon the children the pain and disarray of removal from home and family pending completion of the process. The potential legitimation of relationships cannot be ignored or discounted.
 
 (Guardianship of Smith,
 
 42 Cal.2d 91, 94 [265 P.2d 888, 37 A.L.R.2d 867] ; see also, concurring opinion, 42 Cal.2d at p. 98.)
 
 In Corrigan, supra,
 
 the mother’s failure to take curative action was a negative factor in determining her ability to exercise parental control. (134 Cal.App.2d at p. 755.) Progress toward a cure is a positive factor. The juvenile court’s findings took account only of the mother’s past and present relationship and ignored the impending legitimation of that relationship. “. . . past indiscretions do not necessarily demonstrate present unfitness ....’’
 
 (Guardianship of Smith, supra,
 
 concurring opinion, 42 Cal.2d at p. 98.)
 

 
 *263
 
 There was no debate but that poverty had played a major role in producing the home situation which evoked the wardship order. Adequately financed couples can afford divorce. Many take the step nonchalantly, quickly severing their marriages in jurisdictions which invite such business and changing mates with great readiness. The children of quickie marriages and quickie divorces need never find themselves in homes characterized by a permanent liaison such as Mrs. Raya’s. For centuries the law has termed such liaisons meretricious or adulterous. Perhaps, in this day of casually created and broken marriages, the label should be applied with less readiness when poverty is a prime factor in producing the relationship. There is a danger here of imposing standards adapted to the well-to-do, who can usually pay for the forms of legitimacy, and ill-adapted for the poor, who frequently cannot.
 
 [5]
 
 Attempts to apply “across the boards” standards to rich and poor alike may avoid a theoretical discrimination and create a practical one.
 
 [6]
 

 Able and vigorous counsel have urged upon us competing moral considerations. On one hand we are told that there are subcultures in American society whose economic poverty bars them from access to divorce and impels the formation of nonmarital households; that the Aid to Dependent Children
 
 [7]
 
 provisions of the Welfare and Institutions Code contemplate support of children in their own homes
 
 [8]
 
 even though, by a 1961 amendment, a “mole person assuming the role of spouse” lives in the household;
 
 [9]
 
 that the 1961 amendment evidences legislative sanction for such non-marital households among needy citizens; that this sanction should be observed in the application of those sections of the Welfare and Institutions Code forming the Juvenile Court Law. On the other hand, we are told that reversal of the wardship order will evince judicial disrespect for the marriage insti
 
 *264
 
 tntion and set the seal of judicial approval on adulterous relationships.
 

 If abstract legal propositions fail to decide concrete cases, abstract moral dogmas accomplish even less. The safest moral guides for the courts are those crystallized in the statutes and ease law. In determining whether the evidence supported an adjudication of Mrs. Raya’s parental incapacity, the court neither excuses nor condemns. It simply decides that in these particular circumstances the finding of parental incapacity was unjustified by the facts.
 

 Counsel for the appealing parents argue that “depravity” of the parent is a ground of wardship under subdivision (b) of section 600; that depravity alone controls in wardship cases resting upon parental immorality; that the statutory requisite of depravity cannot be evaded by utilizing some lesser degree of immorality as the sole basis for a finding of improper parental care or control under subdivision (a) of section 600.
 
 [10]
 
 Since the present adjudication does not meet the less stringent terms of section 600, subdivision (a), there is.no point in deciding whether the more stringent terms of section 600, subdivision (b), control.
 

 Finally, we deal with an assertion that
 
 In re Corrigan, supra,
 
 134 Cal.App.2d 751, and
 
 In re Schultz, supra,
 
 99 Cal.App. 134, are binding precedents, requiring the juvenile court to adjudicate wardship by force of
 
 stare decisis.
 
 The cited decisions sustained wardship adjudications where the mother (in
 
 Schultz,
 
 a woman
 
 in loco parentis)
 
 was exposing the children to her extramarital sexual activity. It would be simple to point to factual distinctions between those cases and this; or to counterbalance them with another child custody decision where the reviewing court reversed an order taking children from the mother under circumstances comparable to the present.
 
 (Ashwell
 
 v.
 
 Ashwell,
 
 135 Cal.App.2d 211 [286 P.2d 983].) We know of no principle, however— and none has been cited to us—substituting
 
 stare decisis
 
 for individualized determinations in these cases.
 

 The judgments are reversed with directions to dismiss the wardship petitions.
 

 [1]
 

 Said section provides in part:
 

 “Any person under the age of 21 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court:
 

 “(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control.”
 

 (Section 600, subd. (b), also includes a child “whose home is an unfit place for him by reason of neglect, cruelty, or depravity of either of his parents ....”)
 

 [2]
 

 See Kay & Philips,
 
 Poverty and the Law of Child Custody,
 
 54 Cal.L.Rev. 717, 733 et seq.
 

 [3]
 

 See, e.g., Kay & Philips,
 
 op. cit. supra
 
 (fn. 2) pp. 736-738.
 

 [4]
 

 See Paulsen,
 
 Juvenile Courts, Family Courts, and the Poor Man,
 
 54 Cal.L.Rev. 694, 699. In another context, it has been observed that juvenile courts sometimes lack facilities and techniques for adequate performance in a parens patriae cacapity.
 
 (Kent
 
 v.
 
 United States,
 
 383 U.S. 541, 555-556 [16 L.Ed.2d 84, 94, 86 S.Ct. 1045] per Portas, J.)
 

 [5]
 

 See Foster and Freed,
 
 Unequal Protection: Poverty and Family Law,
 
 42 Ind.L.J. 192, 198-199; tenBroek,
 
 California’s Dual System of Family Law: Its Origin, Development, and Present Status,
 
 17 Stan.L.Rev. 614, 617-621. The court does not overlook Penal Code section 269a, declaring guilty of a misdemeanor every person “who lives in a state of cohabitation and adultery . . .
 

 [6]
 

 See Lewis and
 
 Levy, Family Law and Welfare Policies: The Case for “Dual Systems,’’
 
 54 Cal.L.Rev. 748-780; Weyrauch,
 
 Dual Systems of Family Law: A Comment,
 
 54 Cal.L.Rev. 781-791.
 

 [7]
 

 Welfare and Institutions Code section 11200 et seq.
 

 [8]
 

 Welfare and Institutions Code section 31205.
 

 [9]
 

 Welfare and Institutions Code section 11351; see tenBroek,
 
 op. cit. supra
 
 (fn. 5), 17 Stan.L.Rev. at p. 654 et seq.
 

 [10]
 

 The terminology in question has been part of the California Juvenile "Court Law ever since its adoption. (Stats. 1909, ch. 133, § 1; Stats. 1915, ch. 631, § 1; former § 700, Welf. & Inst. Code, as added by Stats. 1937, ch. 369.) In company with the juvenile court laws of several other states, it seems to have originated in a formulation adopted by the Illinois legislature in 1899. (See Grygier,
 
 The Concept of the “State of Deliquency” and its Consequences for Treatment of Young Offenders,
 
 11 Wayne L.Rev. 637, 638-640.)