[L.A. No. 30181. In Bank. June 20, 1974.]

In re B. G. et al., Persons Coming Under the Juvenile Court Law.
VLASTA Z., Plaintiff and Appellant, v.
SAN BERNARDINO COUNTY WELFARE DEPARTMENT et al.,
Defendants and Respondents.

## COUNSEL

Slaff, Mosk & Rudman, Edward Mosk, Vinnedge, Lance & Glenn and Gary V. Spencer for Plaintiff and Appellant.

Robert H. Mnookin and F. Raymond Marks as Amici Curiae on behalf of Plaintiff and Appellant.

No appearance for Defendants and Respondents.

David Keene Leavitt as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**TOBRINER, J.**—Bedrich G. fled Czechoslovakia in 1968 with his two children and entered the United States as a political refugee. After Bedrich died in 1969, the juvenile court took jurisdiction over the children and placed custody with foster parents in California. Their mother, a resident of Czechoslovakia, now seeks to recover custody of her children. The juvenile court, however, ruled that the best interests of the children would be promoted by continuing their placement with the foster parents; the mother appeals from that order.[1]

The present case is the first juvenile court custody dispute to come before us since passage of the Family Law Act in 1969 and the only reported case, to our knowledge, in which a superior court has awarded custody to a nonparent against the claim of a parent expressly found fit to care for the children. These circumstances compel us to inquire into the relation-

---

[1] Roy and Madeline Smith (referred to herein as foster parents) appearing as amici curiae, have undertaken to defend the juvenile court order on this appeal. The nominal respondents, the San Bernardino County Welfare Department and the minors' grandparents, have filed no appearance. The juvenile court appointed an attorney to represent the minors but terminated that appointment after the hearing; the children are not separately represented on this appeal.

ship of the Family Law Act to custody proceedings under the Juvenile Court Law. We have concluded that Civil Code section 4600 governs custody awards in juvenile court proceedings, and that under this section it is no longer essential that a court, to award custody to a nonparent, find the parent unfit to care for the child. Such an award, however, must be supported by an express finding that parental custody would be detrimental to the child and that finding must be supported by evidence showing that parental custody would actually harm the child.

We summarize briefly our resolution of the issues raised by this appeal. First, we observe that although the juvenile court failed to notify the mother of her right to appear at the 1969 jurisdictional hearing, the mother has waived that omission and consented to the jurisdiction of the court. We also confirm the ruling of the superior court granting the foster parents' standing to appear as parties in this proceeding. We cannot, however, affirm the order of the juvenile court awarding custody to the foster parents, since that order does not conform to the requirements of section 4600. The court rendered no finding that an award of custody to the mother would be detrimental to the children; its opinion, moreover, strongly suggests that the juvenile court decided the question of custody solely on the basis of the "best interests" of the children, without applying the principle that an award of custody to the parent is the preferred disposition, and that a contrary result requires a showing that such custody would be actually harmful to the child. We therefore reverse the order of the juvenile court and remand the cause to that court for further proceedings.

1. *The facts.*

V. G. and B. G. (hereinafter referred to as the children) were born in Czechoslovakia in 1963 and 1964, respectively, the children of the marriage of Bedrich and Vlasta G. In August 1968, shortly after Soviet troops occupied Czechoslovakia, Bedrich, their father, fled the country with his two children. Vlasta, their mother, did not consent to the children's departure nor did she know about it until she arrived home from work. The father took the children to Munich, West Germany.

The father remained in Munich for about six months. During this period he attempted to persuade his wife to join him; she, in turn, sought to convince him to return to Czechoslovakia with the children.[2]

---

[2]In October 1968, without notice to her husband, Vlasta obtained a Czech divorce decree which awarded her custody of the children. She testified that she undertook these proceedings because she was advised by counsel that a custody decree would facilitate the return of the children to her own country.

In March 1969, the father's mother and stepfather (hereinafter referred to as grandparents, grandfather or grandmother), residents of Yucaipa, California, sent the father funds to enable him to come to the United States. The father and children flew to California and entered the United States as political refugees. They went to live with the grandparents; the father found employment and arranged for day care for the children with neighbors, Roy and Madeline Smith. Three weeks after his arrival in California the father collapsed; a medical examination revealed terminal cancer. In June 1969, the father, who was then too weak to write, dictated a "will" to an interpreter in which he stated that the children should remain in the United States.[3] The father died on July 8, 1969.

The mother, who was injured in an automobile accident in November 1968, was still recuperating in May 1969, when she first learned that the children's father was seriously ill. The grandparents sent her an airplane ticket but apparently failed to supply the necessary documents to secure a visa.[4]

The probation department, informed that the father had died and that the children were staying with the Smiths, who had applied for a foster home license, scheduled a dependency hearing. The department did not orally contact the grandparents, who could not be reached because of their work schedules, but sent them notice of the dependency hearing by mail. It did not notify the mother or any agency, such as the embassy, that might reasonably be expected to forward notice to the mother.[5]

On August 29, 1969, the minors appeared in juvenile court in response to petitions filed by the social worker. The petitions stated that: (1) the father had died in California; (2) the "mother's exact whereabouts is unknown; she is presumed living in Czechoslovakia"; and (3) the children are Czechoslovakian nationals. The court found the allegations true, adjudged the minors dependent children of the juvenile court, and placed

---

[3]This "will" reads as follows: "Request: I, [father], undersigned—born in 1934—hereby request that my children [daughter], age 6—and [son], age 5—should remain in the United States of America. I do not want them to be sent back to Czechoslovakia. My first wish that my mother should have the children. If she is not able to have them or care for them, I would like [the foster parents] to care for them."

[4]The grandparents later sent another airplane ticket accompanied by the required documentation, but the mother denies receiving this second ticket.

[5]The department file includes a dictated notation of July 7, 1969, suggesting that the department was aware of the mother's attempts to secure the return of the children through the auspices of the Red Cross and the Czechoslovakian Embassy; the notation indicates that the department had the mother's address or, at the very least knew that it could be secured from the grandparents.

them in the custody of the welfare department to be maintained in the home of the Smiths as their foster parents.[6]

During the next two years the children resided with the foster parents. The matter came before the court for annual review in August 1970, but the mother received no notice of this proceeding; the court confirmed the disposition established by the August 1969 order. During this period the mother and grandmother continued to exchange correspondence, but the mother was never informed that the children were living with foster parents or that they were subject to court supervision. On September 27, 1970, the mother remarried. She continued her efforts to secure help from the Czechoslovakian Red Cross, the Brno Office for the Protection of Children, the Ministry of Foreign Affairs and the Czechoslovakian Embassy in Washington, D.C.

In December of 1970, the grandparents visited the welfare department and informed the department that they had received letters from the Czech Embassy indicating that the embassy thought the children were living with the grandparents and had engaged an attorney to institute proceedings to return the children to their mother. In re-examining the file, the social worker discovered an envelope with the mother's address on it, which apparently had been received some time earlier.

The matter again came before the court for annual review in August 1971. The court, now aware of the mother's desire to regain custody of her children, continued the case for 30 days. After further continuances, the mother appeared by counsel on November 4, 1971, acknowledged the personal and subject matter jurisdiction of the court, and requested the court to exercise that jurisdiction by transferring custody of the children to her. The court ordered that the children would be continued as dependent children of the court, in the custody of the probation officer, but to be maintained in the home of the mother.

The Czech Embassy arranged for the children to fly to Czechoslovakia on November 18, and the parties agreed that a welfare worker, the grandparents, and the foster parents would bring the children to the airport. On November 18, however, the children disappeared. The grandparents told the welfare worker "if you want to know where the kids are, watch T.V."

---

[6]After the hearing, the welfare department received a letter from the International Social Service, dated September 8, 1969, acknowledging receipt of the department's letter which had requested help in locating the mother. The service stressed the difficulty of the task but requested more detailed information about the mother's whereabouts. This letter was never answered by the department nor were any further contacts made with the grandparents for over a year.

The children and the foster parents appeared on the evening television news; the foster parents announced that they and the minors were going into hiding.

The next morning an attorney representing the foster parents filed a petition for writ of prohibition with the Court of Appeal.[7] That court denied the petition on condition that the juvenile court vacate its order of November 4, and reopen the proceedings "for the purpose of conducting the Dispositional Hearing."

When that hearing began on February 28, 1972, the foster parents asserted that the juvenile court lacked jurisdiction because of its failure to notify the mother of the August 1969 jurisdictional hearing. The mother's counsel stipulated to the court's jurisdiction over the mother as of the 1969 hearing. The court then denied the foster parents' motion to dismiss. The foster parents petitioned for habeas corpus in the Court of Appeal, again asserting that the juvenile court lacked jurisdiction over the minors, but the Court of Appeal denied the petition.

On March 15, 1972, at the end of the dispositional hearing, the juvenile court stated orally its findings and reasoning. The court first noted that everyone involved—the mother, the foster parents, and the grandparents—were "fine people," and that the children had received proper and loving care from the grandparents and foster parents.[8] He then expressly found that the mother was a fit parent for the children.[9] the court, however, expressed its concern that the mother had encountered difficulties in relating to both her present and her former husband, that she displayed little warmth toward the children, and that the children had adapted to living in America and largely forgotten the Czech language.[10]

---

[7]On November 23, 1971, the foster parents petitioned for appointment as guardian for the children. The guardianship petition has not been heard because of the pendency of the present proceeding under the Juvenile Court Law.

[8]The trial judge interviewed the children, who said they preferred to stay with the foster parents. The court observed, however, that the only reasons given by the children for their preference were "childish," and that he gave them no weight in reaching his decision.

[9]"We come to the question of whether [the mother] is a fit or an unfit parent. There has been no evidence presented to this court whatsoever that would indicate that [the mother] is a bad person or an evil person, or that she has ever done anything other than provide adequate food, clothing, shelter, attention for her children while she had them and the child she has now. It is obvious to the court that she is an intelligent woman; she is neat, clean and dresses well. According to the testimony, she has a good job. She owns and maintains an adequate home . . . Her personal morals appear to be adequate by modern standards. . . ."

[10]"I can't help but conclude from the testimony that [the mother] has not coped well with the problems of marriage and home and motherhood. I don't know whether

The court concluded that "We have to weigh and balance the good and the bad in both directions and then choose that which, all in all, will be in the best interests of the children. . . . At any rate, it is the considered decision of the Court and one, I might say, that I arrived only at the tag end of the trial, that the welfare and best interests of the children require that they be continued as dependent children of the Court to be maintained at a home to be selected by the Court; in the meantime to be detained at the home of [the grandparents]." The court rendered no finding whether an award of custody to the mother would be detrimental to the children.[11] After concluding its statement, the court entered a minute order continuing the children in the custody of the probation officer, to be maintained at the grandparents' home pending a probation study. Shortly thereafter, the court returned the children to the foster parents.

---

this is due to her personal personality or psychological problems, or whether it is due to the culture in which she lives. Maybe, to some extent, it is due to the modern liberation of women movement. She apparently does a good job at her employment, but you can't help but note that both of her marriages were impelled by unwanted pregnancies, that the second child of the first marriage was unwanted.

"I can't help but observe from the testimony, particularly from reading the letters written to her by her first husband, [the father] and saved by her, that there were serious problems between her and [the father] . . . .

"There has been much talk in the evidence about [the mother's] inability to express her warmth, her love for the children.

". . . Apparently that has been a problem from the beginning.

"The little evidence we have of her second marriage seems to indicate bad omens for the future.

"I find it difficult to conceive how a woman marrying a younger man and requiring him to sleep in the living room, while she sleeps in the bedroom with the child, can expect a long and happy married life.

"These things, none of them are determinative. They are all just things which are apparently so and which I have to consider. . . .

"I have been extremely empathetic with [the mother], her situation in coming to a strange country, thinking she was just going to come pick up her children and go home apparently very quickly, and finding out that it's going to be a long, drawn-out court battle. . . .

"The evidence makes it quite clear that [the mother] was unable to cope with that situation, and I think just had to hope that upon getting the children back home and learning the language that these things would all work out; but there appeared to be no real effort on her part to start working them out now.

"I have been impressed by all of the evidence that [the mother], . . . perhaps being a bright woman, being a handsome woman, being a success in her occupation has grown much more accustomed to getting than to giving."

The trial court also relied upon the testimony of Dr. Beukema, a psychiatrist, that the children would suffer emotional damage at being separated from the foster parents and might have difficulty reestablishing a close relationship with their mother.

[11]The juvenile court admitted evidence on political conditions in Czechoslovakia to determine whether the children would encounter any disabilities by reason of their father's defection. The evidence on this point, however, was inconclusive, and the trial judge, in his oral presentation, stated that his decision was not based on political considerations.

The mother appeals from the juvenile court's minute order continuing the court's jurisdiction over the children, and denying her legal and physical custody.

## 2. *The jurisdiction of the court.*

■ The 1961 amendments to the Juvenile Court Law (Welf. & Inst. Code, §§ 500-945) established a bifurcated juvenile court procedure. The court must first hear evidence on whether the minor is a person falling within the description set out in sections 600, 601, and 602, and hence subject to the jurisdiction of the juvenile court. (§ 701.)[12] If the evidence shows the minor is not a person described by those sections, the court must dismiss the petition and discharge the minor. (§ 702.) If, on the other hand, the court determines the minor falls within the court's jurisdiction, it must enter a finding to that effect, and only then can it receive evidence respecting the proper disposition of the minor. (§ 702; see *In re Gladys R.* (1970) 1 Cal.3d 855, 859 [83 Cal.Rptr. 671, 464 P.2d 127].)

In the present case, the mother contends that the juvenile court never established jurisdiction over the minors, and thus erred in holding a dispositional hearing; furthermore, she argues, the record of that hearing uncontrovertably shows that there now exists no factual basis on which the juvenile court could assume jurisdiction over the children. Welfare and Institutions Code section 600, subdivision (a), permits the court to adjudge a minor to be a dependent child of the court if he "is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, *or has no parent or guardian actually exercising such care or control.*" (Italics added.) As of August 29, 1969, the children's father was dead; their mother was in Czechoslovakia recovering from an auto accident; they had no legal guardian. The juvenile court therefore found the children fell under the terms of this section and adjudged them dependents of the court.

Nonetheless, the jurisdictional determination of August 29, 1969, suffers from a fatal defect. Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208]; *Lois R.* v. *Superior Court* (1971) 19 Cal.App.3d 895, 901 [97 Cal.Rptr. 158]), the state, be-

---

[12]Except for Civil Code sections 138 and 4600, all code sections herein are from the Welfare and Institutions Code.

fore depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard. (*In re Moilanen* (1951) 104 Cal.App.2d 835, 842 [233 P.2d 91]; *In re Spiers* (1936) 15 Cal.App.2d 487, 491 [59 P.2d 838].) In the present matter, the probation department either knew the address of the mother, or knew that it could obtain that address from the grandparents. Yet it neither made such inquiry of the grandparents, nor exerted any effort to deliver notice to the mother through the Czech Embassy or through international organizations. Instead, presuming that the mother's whereabouts was unknown, the department eschewed reasonable efforts to find her and dispensed with any form of notice to her.

We recognize that the department, faced with the task of notifying a resident of a foreign nation whose address may be uncertain, may be called upon to use unconventional forms of notice which may not always succeed in apprising the party of his opportunity to appear (see *Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 315 [94 L.Ed. 865, 873-874, 70 S.Ct. 652]). But total absence of notice in any form cannot comport with the requirements of due process. (See *Mullane* v. *Central Hanover Tr. Co.*, *supra*, 339 U.S. at pp. 314-315 [94 L.Ed. at pp. 873-874]; *Guerrero* v. *Carleson* (1973) 9 Cal.3d 808, 811 [109 Cal.Rptr. 201, 512 P.2d 833].)

We conclude, however, that the mother has waived her right to challenge the August 29, 1969, order establishing the jurisdiction of the juvenile court. When the mother first appeared before the court through counsel in November of 1971, she did not seek to terminate jurisdiction or challenge the validity of the 1969 order. To the contrary, she filed points and authorities asking the court to transfer custody to her, thereby impliedly recognizing the jurisdiction of the court to issue a dispositive order. When the foster parents subsequently attacked the court's jurisdiction by a motion to dismiss and by a petition for habeas corpus, the mother stipulated that the juvenile court did have personal jurisdiction over her after July 1969; she expressly waived any defect in notice. The stipulation and waiver cures any jurisdictional defect in the 1969 proceedings. (See *In re Etherington* (1950) 35 Cal.2d 863, 867 [221 P.2d 942].)

The mother further points out that the jurisdiction of the juvenile court rested upon its finding that, in August 1969, no parent was available to exercise care and control over the children, but that at the present instance she has come to the United States and is willing and capable of exercising such care and control. She contends, therefore, that the jurisdiction of the court should terminate. She urges that the decision of the Court of Appeal in *In re Neal D.* (1972) 23 Cal.App.3d 1045 [100 Cal.Rptr. 706] lends support to her contention.

In *Neal D.* the juvenile court, pursuant to section 600, subdivision (b), established jurisdiction on the ground that the mother's residence, a condemned dwelling, did not provide a suitable abode for the minors. Six months later the mother petitioned under section 778 to terminate jurisdiction because she had obtained a suitable home. The court, over the mother's objection, received a report from a social service worker which discussed the physical, mental, emotional, and social problems of the mother—all matters which were not considered at the original hearing—and on the basis of that report denied the petition to terminate jurisdiction.

The Court of Appeal reversed the juvenile court order. Its opinion analogized a hearing to terminate jurisdiction under section 778,[13] the procedural setting of *Neal D.*, to an annual review under section 729,[14] the setting of the present case. It then stated that "section 729 contemplates a further hearing to determine whether the original jurisdictional facts continue to exist. . . . [T]he dispositional order following a hearing under section 729 is to be based upon continuing jurisdictional facts and circumstances which warranted the original order. . . . [W]here a minor . . . is readjudicated a ward for new and different reasons from those litigated in the original proceeding, a supplemental petition must be filed alleging the grounds upon which the readjudication is to be predicated. . . ." (23 Cal.App.3d at pp. 1049-1050.)

In the present case, the original basis of jurisdiction—the absence of a parent able to exercise care and control—patently no longer exists. Reviewing the possible grounds for jurisdiction under section 600, we observe that both the mother and the foster parents are available to care for the children; both parent and foster parents can provide them with a suitable home and the necessities of life; the children are not physically dangerous to the

---

[13]Section 778 provides in part that: "Any parent or other person having an interest in a child who is a ward or dependent child of the juvenile court or the child himself through a properly appointed guardian may, upon grounds of change of circumstances or new evidence, petition the court in the same action in which the child was found to be a ward or dependent child of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. . . . [¶] If it appears that the best interests of the child may be promoted by the proposed change of order or termination of jurisdiction, the court shall order that a hearing be held and shall give prior notice, . . ."

[14]Section 729 states that: "Every hearing in which an order is made adjudging a minor a dependent child of the juvenile court pursuant to Section 600 and every subsequent hearing in which such an order is made, . . . shall be continued to a specific future date not more than one year after the date of such order. . . . The court shall advise all persons present of the date of the future hearing and of their right to be present, to be represented by counsel and to show cause, if they have cause, why the jurisdiction of the court over the minor should be terminated. . . ."

public; they are not suffering from neglect, cruelty, depravity, or physical abuse. The facts suggest no basis for jurisdiction under sections 601 or 602. Thus if a showing of a continuing basis for jurisdiction is essential for a dispositive order under section 729, as *Neal D.* indicated, we would be compelled to conclude that the juvenile court in the instant proceeding lacked the authority to make a dispositive order.

We believe, however, that *Neal D.,* in requiring a continuing basis for jurisdiction, incorrectly interpreted the Juvenile Court Law.[15] Section 607 specifies that the juvenile court "may retain jurisdiction over any person who is found to be a ward or dependent child of the juvenile court until such ward or dependent child attains the age of 21 years." Section 778, which authorizes the parent to petition to terminate the court's jurisdiction, directs the court to hear that petition only "If it appears that the best interests of the child may be promoted by the proposed . . . termination of jurisdiction." Section 729, which requires annual review of dependency cases, requires the court to advise all persons present of their right "to show cause, if they have cause, why the jurisdiction of the court over the minor should be terminated"; this section does not state the proof required to terminate jurisdiction, but by parity with section 778, the parent should be required to show that termination would be in the best interest of the child.[16] Thus "[w]hile it was necessary at the original hearing . . . to show that the minor had no parent or guardian willing to exercise or capable of exercising such care or control in order to invoke the jurisdiction of the juvenile court, continuing jurisdiction over the minor is not dependent solely on whether a parent is capable of exercising proper and effective parental control over him but on whether the best interest of the child is served by freeing him from further supervision." (*In re Francecisco* (1971) 16 Cal.App.3d 310, 314 [94 Cal.Rptr. 186]; see *In re Adele L.* (1968) 267 Cal.App.2d 397, 402 [73 Cal.Rptr. 76].)

[15]We agree with the proposition of *Neal D.* that when the county opposes a petition to terminate jurisdiction on some basis other than the basis which justified the original assumption of jurisdiction, it should notify the parent of these additional allegations so that the parent can prepare to meet them. (See *In re Neal D., supra,* 23 Cal.App.2d 1045, 1048.) Our disagreement with *Neal D.* is limited to that court's holding that continuing jurisdiction can be justified only upon facts which would support an initial assumption of jurisdiction under sections 600-602.

[16]See *In re Robinson* (1970) 8 Cal.App.3d 783, 786-787 [87 Cal.Rptr. 678]. In the instant proceeding, the mother appeared at an annual review under section 729 and requested that the court award her custody of the children. She did not petition to terminate jurisdiction under section 778. It has been suggested that the juvenile court, in its annual review of custody matters, has no jurisdiction to restore a child to parental custody absent a petition by the parent under section 778. We cannot agree; the annual review would serve little purpose if the court, on discovering that its former custody order no longer served the interest of the child, had no authority to modify that order. We therefore confirm the ruling that the juvenile court in the instant case had jurisdiction to grant custody to the mother.

In summary, we realize that the court in *Neal D.* sought, understandably, to emphasize the point that the state does not interfere with the parent-child relationship unless the specific conditions set out in sections 600-602 obtain, so that when such conditions no longer exist, the state supervision might logically terminate. But the Juvenile Court Law does not incorporate that mandate; it proceeds on the principle that once juvenile court jurisdiction is established, that jurisdiction continues as long as the best interests of the minor so require. As to the instant case, we therefore conclude that the mother, having waived her right to object to the establishment of jurisdiction in August 1969, is not entitled to require the county to prove such jurisdiction anew at the hearing of February-March 1972. Language to the contrary in *In re Neal D., supra,* is disapproved.

3. *The standing of the parties.*

█ We turn briefly to the problem of the standing of the foster parents in this litigation. The superior court ruled that since the foster parents had applied for letters of guardianship, they could participate as interested parties in the juvenile court proceedings. The Court of Appeal ruled that the foster parents were not parties to the appeal, but permitted their counsel to argue the case as amicus curiae; we followed the same practice. But the unsatisfactory and ad hoc character of these rulings, and the unsettled state of the law respecting the standing in juvenile court of nonparents interested in the welfare of the minor, demonstrates the need for clarification by this court.

The fact of biological parenthood may incline an adult to feel a strong concern for the welfare of his child, but it is not an essential condition; a person who assumes the role of parent, raising the child in his own home, may in time acquire an interest in the "companionship, care, custody and management"[17] of that child. The interest of the "de facto parent"[18] is a substantial one, recognized by the decision of this court in *Guardianship of Shannon* (1933) 218 Cal. 490 [23 P.2d 1020][19] and by courts of other

---

[17]*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208].

[18]We use the term "de facto parent" to refer to that person who, on a day-to-day basis, assumes the role of parent, seeking to fulfill both the child's physical needs and his psychological need for affection and care. (See Goldstein, Freud, & Solnit, Beyond the Best Interests of the Child (1973) p. 98.) We anticipate that juvenile courts will experience little difficulty in determining whether a person is a de facto parent for purposes of standing to appear in a juvenile court custody proceeding. The simple fact that a person cares enough to seek and undertake to participate goes far to suggest that the court would profit by hearing his views as to the child's best interests; if the participant lacks a close relationship with the child, that fact will undoubtedly emerge during the proceedings.

[19]In *Guardianship of Shannon,* we affirmed an order awarding custody of two children to their stepmother, over the claim of the natural mother, on the ground in part

jurisdictions[20] and deserving of legal protection. (See Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (1973) pp. 17-20.)

The status of the de facto parent received statutory sanction with enactment of the Family Law Act in 1969. Previously Civil Code section 138 distinguished only between awards of custody to parents and to nonparents; the Family Law Act, in Civil Code section 4600, added the stipulation that when an award of custody to the parent would be detrimental next in order of preference stands "the person or persons in whose home the child has been living in a wholesome and stable environment."

The juvenile court in a dispositional hearing must undertake "a judicious appraisal of all available evidence bearing on the child's best interests" including an evaluation of the relative merits of alternative custody awards. (*In re A. J.* (1969) 274 Cal.App.2d 199, 202 [78 Cal.Rptr. 880].) The presence of de facto parents will aid the court in that endeavor; the views of such persons who have experienced close day-to-day contact with the child deserve consideration; moreover, an award of custody to such de facto parents is often among the alternate dispositions which the court must evaluate.

We conclude that de facto parents, such as the foster parents in this case, should be permitted to appear as parties in juvenile court proceedings. Their standing should not depend upon the filing of a petition for guardianship, although the filing of such petition may aid in attesting to their interest in the custody of the child; nor should their participation be restricted to the limited role of an amicus curiae; they should be permitted to appear as parties to assert and protect their own interest in the companionship, care, custody and management of the child.[21]

4. *The dispositional order.*

 California courts have long adhered to the principle that a court must award physical custody of a minor to a parent, if fit to exercise cus-

---

that the children "looked upon [the stepmother] as their mother and looked upon [the natural mother] as a person not very near to them because during the five years of their development they had been reared in the home with [the stepmother] as their mother. . . ." (218 Cal. at p. 493.)

[20]See *James* v. *McLinden* (D.Conn. 1969) 341 F.Supp. 1233, 1235; *State* ex rel. *Williams* v. *Juvenile Court* (1925) 163 Minn. 312, 314 [204 N.W. 21, 22]; Foster & Freed, *Child Custody* (1964) 39 N.Y.U.L.Rev. 423, 436; Comment (1963) 73 Yale L.J. 151, 158.

[21]We do not hold that a de facto parent is a "parent" or "guardian" as those terms are used in the Juvenile Court Law, nor do we express a position whether constitutional principles of due process or equal protection may require that a de facto parent, in some instances, receive rights of notice, hearing, or counsel afforded natural parents or guardians under that law.

tody, as against a stranger.[22] This principle, which the cases label the doctrine of parental preference, originally rested upon the theory that the right of a parent in his child was akin to that of a property owner in his chattel. (*In re Campbell* (1900) 130 Cal. 380, 382 [62 P. 613].) To modern thinking, a far better rationale is that explained by Justice Traynor in his concurring opinion in *Guardianship of Smith* (1954) 42 Cal.2d 91 [265 P.2d 888, 37 A.L.R.2d 867]; that "the child's welfare is part of the responsibility of a fit parent" (42 Cal.2d at p. 95), and, indeed, that a parent fit to exercise custody may have a better understanding of the best interests of his child than does the juvenile court.[23]

In applying the parental preference doctrine, the courts have required "a fairly extreme case" before finding a parent unfit to exercise custody. (*In re Raya* (1967) 255 Cal.App.2d 260, 265 [63 Cal.Rptr. 252]; *Lois R.* v. *Superior Court* (1971) 19 Cal.App.3d 895, 901 [97 Cal.Rptr. 158].) *Raya* observes that "Although a home environment may appear deficient when measured by dominant socioeconomic standards, interposition by the powerful arm of the public authorities may lead to worse alternatives. A juvenile court may possess no magic wand to create a replacement for a home which falls short of ideal. California appellate decisions in wardship cases of the 'dependent child' variety demonstrate rather extreme cases of neglect, cruelty, or continuing exposure to immorality." (255 Cal.App.2d at p. 265; see *In re A. J., supra,* 274 Cal.App.2d 199, 202.)

Thus, prior to the enactment of the Family Law Act in 1969, the decisions had held that an award denying custody to the parent in favor of a

---

[22]See, e.g., *Guardianship of Smith* (1954) 42 Cal.2d 91, 92-93 [265 P.2d 888, 37 A.L.R.2d 867]; *Stewart* v. *Stewart* (1953) 41 Cal.2d 447, 452 [260 P.2d 44]; *Roche* v. *Roche* (1944) 25 Cal.2d 141, 144 [152 P.2d 999]; *Moffitt* v. *Moffitt* (1966) 242 Cal.App.2d 580, 582-583 [51 Cal.Rptr. 683]; 2 Armstrong, California Family Law (1953) pp. 993-1006; tenBroek, *California's Dual System of Family Law: Its Origin, Development and Present Status* (1964) 16 Stan.L.Rev. 900, 919-927.

Courts of other states vary in the degree to which they permit a preference for parental custody to overcome a finding based on the best interests of the child. For a review of the various standards employed in awarding custody by different jurisdictions, see Foster & Freed, *Child Custody* (1964) 34 N.Y.U.L.Rev. 423, 427-437; Comment (1945) 33 Cal.L.Rev. 306; Comment (1963) 73 Yale L.J. 151.

[23]"If a parent is fit he will be vitally concerned with the best interests of his child. By leaving to him the responsibility as to how those interests will be best served the court simply recognizes that 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. *Pierce* v. *Society of Sisters, supra* [268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468]. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.' (*Prince* v. *Massachusetts,* 321 U.S. 158, 166 [64 S.Ct. 438, 88 L.Ed. 645].)" (*Guardianship of Smith, supra,* 42 Cal.2d at p. 97 (concurring opinion of Traynor, J.).)

nonparent could stand only if the parent had been proven to be unfit. As we shall show, with the enactment of the Family Law Act, the standard of unfitness was dropped and the Legislature created the new rule that in order to award custody of a child to a nonparent the court was required to render a finding that an award to a parent would be "detrimental to the child" and that such an award to a nonparent was "required to serve the best interests of the child."

The juvenile court in the present case rendered no finding that the award would be detrimental to the child; it proceeded, instead, upon the assumption that it could weigh and balance the merits and demerits of alternative placements free of any significant parental right. The instant case, consequently, poses the question whether the Family Law Act repudiates or modifies the doctrine of parental preference and permits a dispositional order based solely on a finding as to the "best interests" of the child.

The Family Law Act, in Civil Code section 4600 provides that "In any proceeding where there is at issue the custody of a minor child, the court may, during the pendency of the proceeding, or at any time thereafter, make such order for the custody of such child during his minority as may seem necessary or proper. If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court shall consider and give due weight to his wishes in making an award of custody or modification thereof. Custody should be awarded in the following order of preference:

"(a) To either parent according to the best interests of the child.

"(b) To the person or persons in whose home the child has been living in a wholesome and stable environment.

"(c) To any other person or persons deemed by the court to be suitable and able to provide adequate and proper care and guidance for the child.

"*Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it must make a finding that an award of custody to a parent would be detrimental to the child, and the award to a nonparent is required to serve the best interests of the child. . . .*" (Italics added.)

We believe that Civil Code section 4600 governs the case at bar. Although the present appeal concerns a custody order under the Juvenile Court Law, this procedural setting is fortuitous; the issue of custody could as readily have been raised by an application for letters of guardianship, a writ of habeas corpus, or, had the father lived, an action for dissolution

of marriage.[24] In fact, California has at least eight separate proceedings in which custody questions can be litigated. (See Bodenheimer, *The Multiplicity of Child Custody Proceedings—Problems of California Law* (1971) 23 Stan.L.Rev. 703, 704-705.) There can be no question of the desirability of a uniform rule; the Legislature's specification that section 4600 applies to "any proceeding where there is at issue the custody of a minor child" demonstrates that section 4600 was enacted to fulfill that objective.[25]

■ We turn, then, to the legislative history of section 4600 to determine the effect of that section upon the judicially established doctrine of parental

[24]An amicus brief filed by the Childhood and Government Project argues that section 4600 governs dissolution and guardianship proceedings, but not cases arising under the Juvenile Court Law. The brief expresses the fear that a juvenile court judge, employing the "best interests" standard of section 4600, will take children from their parents because the judge personally disagrees with the parents' moral or cultural values, or because the parents' limited means make it impossible for them to maintain a home which complies with his standards of order or cleanliness. (See generally, Mnookin, *Foster Care—In Whose Best Interest* (1973) 43 Harv.Ed.Rev. 599.) We believe these fears unwarranted. The "best interests" test does not confer jurisdiction upon the juvenile court; that court, before making any dispositional order, must first find the minor a dependent child under the specific provisions of sections 600, 601, and 602. Secondly, as we interpret section 4600, the court cannot take custody from a parent to place the child with a nonparent without a showing and finding that parental custody would be detrimental to the child.

[25]In *Guardianship of Marino* (1973) 30 Cal.App.3d 952, 958 [106 Cal.Rptr. 655], the Court of Appeal held that section 4600 governs custody awards in guardianship proceedings. The court stated that "There is no restriction in the language used by the Legislature to a situation involving the dissolution of a marriage. . . . We find no legally significant reason for using a different approach in the awarding of custody in a dissolution matter from the awarding of custody of a minor child in a nondissolution situation." (30 Cal.App.3d at p. 958.)

In most juvenile court dispositional hearings custody awards are governed by Welfare and Institutions Code section 726, which states that: ". . . no ward or dependent child shall be taken from the physical custody of a parent or guardian unless upon the hearing the court finds one of the following facts:

"(a) That the parent or guardian is incapable of providing or has failed or neglected to provide proper maintenance, training, and education for the minor.

"(b) That the minor has been tried on probation in such custody and has failed to reform.

"(c) That the welfare of the minor requires that his custody be taken from his parent or guardian."

The language of section 726 should be interpreted in *pari materia* with the requirement of section 4600 that in any proceeding in which custody is at issue, an award to a nonparent against a parent claim requires a finding of detriment. Under this interpretation, subdivisions (a) and (b) of section 726 present specific instances of detriment justifying an award of custody to a nonparent; the term "welfare of the minor" in subdivision (c) encompasses a requirement that an award of custody to the nonparent rests upon a finding that parental custody would be detrimental.

In the instant proceeding, the court did not take the children from the physical custody of the mother; it simply refused to restore physical custody to her. Thus section 726 is technically inapplicable to the case at bar, and Civil Code section 4600 is not only the controlling statute, but also the only statute governing the court's dispositional award.

preference. The present Family Law Act finds its origin in the 1966 Report of the Governor's Commission on the Family (hereafter Report). The commission recommended the enactment of a statute similar to the present section 4600, but which would have provided that "[T]he Court may award custody to persons other than the father or mother or *de facto* custodian if it finds that such award is required to serve the best interests of the child." (Report, p. 99.)

Explaining its refusal to require that such custody awards rest upon a finding of parental unfitness, the commission stated that "We have no intention of undermining the parents' right to the custody of their children, and we believe that the primacy of those rights must be preserved. We are convinced, however, that no useful purpose can be served by forcing a formalized finding of unfitness. The cases in which the child's best interest would require a custodial award to a third person may be rare, but are nonetheless serious. To take the most common example, if the custodial parent dies and the Court should specifically find that the child's welfare would be best served by awarding custody to the stepparent, with whom the child has been living and with whom he has formed a warm and stable relationship, should not the Court be able to so order without having to find a long-absent or minimally-interested parent judicially unfit? We believe that it should." (Report, pp. 39-40.)

Commenting on the commission's Report, Judge Lindsley of the San Diego Superior Court expressed concern that the proposed statutory language would permit a change in custody "merely because a subjective conclusion is reached that the child's interests will be better served somewhere else than with his parents and without any decision that the home of the parent would *not* be good for him." (Lindsley, *The Family Court* (1968) 5 Cal. Western L.Rev. 7, 21; see also Kay, *A Family Court: The California Proposal* (1968) 56 Cal.L.Rev. 1205, 1238-1239.) Sharing that concern, the Legislature amended the proposed statute to add a requirement that a court, before awarding custody to a nonparent, "make a finding that an award of custody to a parent would be detrimental to the child."

The report of the Assembly Judiciary Committee states the reasons for this amendment: "Limitation of the power of the court to award custody of children to persons other than a parent is the primary intent of the provisions in the new act relating to child custody. Effort was made to avoid a *Painter* v. *Bannister* [258 Iowa 1390, 140 N.W.2d 152, *cert. denied,* 385 U.S. 949 (1966)] situation in California. In that case, an Iowa court awarded custody to Iowa grandparents of a young boy who had been temporarily living with them with the permission of his father

after the accidental death of his mother. The court disapproved of the "Bohemian" mode of living and intellectuality of the photographer father, a California resident, despite evidence that the father cared greatly for the child, was regularly employed and relatively successful, had remarried and would provide a stable environment. The court reasoned that Iowa farm life would be better for the interests of the child. . . .

"[B]efore custody can be awarded to one other than a parent, the court must specifically find that an award of custody to a parent would be detrimental to the child, and that the award to a nonparent is required to serve the best interests of the child. What is 'detrimental' has not been set forth with particularity. It is a nearly impossible task to devise detailed standards which will leave the courts sufficient flexibility to make the proper judgment in all circumstances . . . *The important point is that the intent of the Legislature is that the court consider parental custody to be highly preferable. Parental custody must be clearly detrimental to the child before custody can be awarded to a nonparent.*" (4 Assem. J. (1969 Reg. Sess.) pp. 8060-8061.) (Italics added.)

In summary, the parental preference doctrine, as it existed before the enactment of the Family Law Act, embodied both a requirement that a custody order in favor of a nonparent rest upon a finding of parental unfitness, and the limitation that such an order would be made only in extreme cases. The enactment of section 4600 changes the former principle, and focuses attention not on the unfitness of the parent but the detriment to the child. (See *Guardianship of Marino, supra,* 30 Cal.App.3d 952, 958.) The Legislature did not, however, intend to disturb the judicial practice of awarding custody to nonparents in preference to parents only in unusual and extreme cases. (See Attorney's Guide to Family Law Act Practice (Cont.Ed.Bar (2d ed.) 1972) pp. 283-284.)

As enacted, section 4600 expressly recognizes that custody should be awarded to parents in preference to nonparents. As between parents, it permits the court to award custody "according to the best interests of the child," but in a dispute between a parent and a nonparent, the section imposes the additional stipulation that an award to the nonparent requires a finding that "an award of custody to a parent would be detrimental to the child." Pursuant to the language of this section, the legislative history previously discussed, and the policy of the Juvenile Court Law as set out in section 502,[26] we conclude that section 4600 permits the juvenile court

---

[26]Section 502 reads as follows: "The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably

to award custody to a nonparent against the claim of a parent only upon a clear showing that such award is essential to avert harm to the child. A finding that such an award will promote the "best interests" or the "welfare" of the child will not suffice.[27]

In the present case, the trial court reasoned that it could weigh the advantages and disadvantages of an award to the mother and to the foster parents, and that a slight tipping of the scales in favor of an award to the foster parents would justify the denial to the mother of the custody of her children. As we interpret section 4600, this mode of reasoning is erroneous. Furthermore, the court made no finding that an award of custody to the mother would be detrimental to the children, although such finding is essential to sustain an order granting custody to a nonparent in preference to parental claims. (*Guardianship of Marino, supra,* 30 Cal. App.3d 952, 959.) Since, as the trial court noted, the case is closely balanced, with each alternative custody award presenting both advantages and disadvantages, we find these errors prejudicial.

Both the mother and the foster parents have urged us not to remand this case to the superior court but to render a final custody decision ourselves. Unfortunately, we cannot do so. The issue of custody is one committed to the discretion of the trial court. (See §§ 725, 726.) Only in an exceptional case, in which the record so strongly supported a party's claim to custody that a denial of that claim by the trial court would constitute an abuse of discretion may an appellate court itself decide who should be granted custody; plainly the present case does not fall under that exception.

in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the State; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety and protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes."

[27]Compare *Ferreira* v. *Ferreira* (1973) 9 Cal.3d 824 [109 Cal.Rptr. 80, 512 P.2d 304], in which we stated that in interstate custody disputes a court should order a child returned to the parent entitled to custody unless that act would jeopardize or seriously endanger the child's health or safety. (9 Cal.3d at p. 836.) We added that "The requirement of allegation and proof that the child's health or safety will be 'jeopardized' includes a showing of substantial emotional harm or other forms of injury in addition to physical mistreatment; it does, however, suggest that such showing encompass competent proof of some substantial harm to the child. A mere allegation that an award of custody to the [parent not presently entitled to custody] would further the 'best interest' or 'welfare' of the child, an allegation tendered in all these cases, is not sufficient grounds for denying enforcement to the foreign decree." (9 Cal.3d at p. 837.)

The order of the San Bernardino Superior Court in the instant proceeding, rendered March 15, 1972, is reversed, and the cause remanded for further proceedings consistent with this opinion.

Wright, C. J., Sullivan, J., Files, J.,* and Kaus, J.,* concurred.

**CLARK, J.**—The majority correctly holds that before custody can be awarded to a nonparent, the court must find an award to the parent would be detrimental and an award to a nonparent is necessary to serve the best interests of the child. But the majority incorrectly concludes application of this rule requires reversal of the trial court's decision.

Instead of reversing, we should affirm the trial court's order by entering a formal finding of detriment, as permitted by Code of Civil Procedure section 909. That section provides: ". . . the reviewing court may make findings of fact contrary to or in addition to those made by the trial court. . . . This section shall be liberally construed to the end among others that, where feasible, causes may be finally disposed of by a single appeal and without further proceedings in the trial court except where in the interests of justice a new trial is required on some or all of the issues.

This case is particularly appropriate for utilizing the procedure set forth in section 909.[1] First, both sides join in the unusual request that this court dispose of the matter without remand, suggesting they are satisfied the record is complete following their 11-day trial.

More importantly, the trial judge, though he did not use the magic word *detrimental,* did expressly find an award to nonparents was required for the best interests of the children and in effect clearly determined detriment would result should the children be returned to the natural mother. After making general statements (fn. 9, *ante*) to the effect that the mother was not a bad person, the trial judge found other facts weighing upon the welfare of the children and ". . . upon [the mother's] fitness, as we use that word in California law, as a parent, as distinguished from as a per-

---

*Assigned by the Chairman of the Judicial Council.

[1]In *Guardianship of Marino* (1973) 30 Cal.App.3d 952 [106 Cal.Rptr. 655], decided after trial of the instant case, the Court of Appeal likewise concluded that a finding of detriment is necessary before custody may be taken from a parent. However, while embracing that holding, the majority here fails to mention that the Court of Appeal in *Marino* (at p. 959) itself made the requisite finding of detriment pursuant to section 909. The Court of Appeal having correctly so found in *Marino,* there is even greater cause to similarly and promptly conclude this case.

son."[2] He outlined the facts bearing on fitness[3] and further explained his decision by referring to the psychiatrist's testimony concluding it would be "definitely harmful to the children to return them to Czechoslovakia with their mother."[4] This recitation of facts, coming after his statement concerning fitness as a *parent*—as opposed to as a *person*—clearly reveals he found the requisite detriment supporting his order.

Thus, in having found the children would suffer detriment in their mother's custody, the trial court substantially complied with the custodial

[2]The majority omits this statement, which shows there is no inconsistency between the complimentary and critical language. This omission leads the majority to erroneously call this case the only reported one "in which a superior court has awarded custody to a nonparent against the claim of a parent expressly found fit to care for the children." (*Ante*, at p. 682.)

[3]The mother had not coped well with the problems of marriage, home and motherhood; both marriages were impelled by unwanted pregnancies and even the second child of the first marriage (B.G.) was unwanted; her first husband (the children's father) revealed serious problems between the mother and father when he wrote to her from Germany; one further problem the letters revealed was that the mother had had trouble expressing her love for the children; the omens for the future of her present marriage were bad, the court finding "it difficult to conceive how a woman marrying a younger man and requiring him to sleep in the living room, while she sleeps in the bedroom with the children, can expect a long and happy married life"; the mother had not shown affection for the children after arriving in this country for the hearing: "it would not have been much different if a government attache had come over to pick up the children"—since she and they seemed unable "to just plain run to each other and hug and kiss and say sweet things. You don't even have to speak the same language to express those thoughts"; after their reunion the mother and the children seemed to have grown apart, and at that stage much work would be required for them to accept her as a "present mother to whom they were responsible"; but "[t]he evidence [made] it quite clear that [the mother] was unable to cope with that situation, and I think just had to hope that upon getting the children back home and learning the language that these things would all work out; but there appeared to be no real effort on her part to start working them out now"; and the mother, "perhaps being a bright woman, being a handsome woman, being a success in her occupation, has grown much more accustomed to getting than to giving."

[4]He stated: "The psychiatrist apparently was quite concerned that it would be very bad for the children to tear them up again and send them into a strange environment. [¶] The doctor was not unhopeful. The doctor said kids have a way of surviving. They will make it. However, he was very definite in his statements that the children had gone through a great deal in being taken from their home, native surroundings, friends, mother, and then approximately a year later having their father die in a strange country where they had to learn a new language. . . . [¶] Dr. Beukema's conclusion was that it would be definitely harmful to the children to return them to Czechoslovakia with their mother, that they would probably recover, undoubtedly recover, but to what extent this would leave scars with which they would not be able to cope in later years, he could not predict and he feared for it."

test we announce. Therefore, ordering this case back to the trial court is an empty formalism, eroding both judicial energy and public confidence. Rather, we should now reduce the trial judge's verbal finding to a formal one and affirm his clear order.

McComb, J., concurred.