536 P.2d 197

### In the Matter of the APPEAL IN MARICOPA COUNTY, JUVENILE ACTION NO. J–75482.

#### No. 11545–PR.

Supreme Court of Arizona,
In Banc.
May 30, 1975.

**590**

Gary K. Nelson, Atty. Gen. by Harold J. Merkow and Michael S. Flam, Asst. Attys. Gen., Phoenix, for appellee.

Selden & Stevenson by James L. Stevenson, Phoenix, for appellant.

HOLOHAN, Justice.

The Superior Court of Maricopa County, exercising its juvenile jurisdiction in a dependency proceeding, found the three children of appellant to be dependent children and made them wards of the court. The appellant mother filed a timely appeal. The Court of Appeals reversed the decision of the trial court in a memorandum decision. A petition for review by the state, acting through the Department of Economic Security, was granted. The opinion of the Court of Appeals is vacated.

Essentially two issues are presented for consideration: whether inadmissible evidence was considered by the court in arriving at the decision and whether there is sufficient evidence to support the decision of the superior court.

The petition alleged that the children were without proper and effective parental care and that their mother was emotionally unstable and suffers from depression; it further alleged that the father, under his present living arrangements was not able to exercise proper parental care and control.

 The petition sought to have the children declared to be dependent children as defined in A.R.S. § 8–201(10). The basis alleged for seeking this status was that the children lacked proper and effective parental care and control. The petition did not allege that there was any fault or wrongdoing on the part of the mother, but there is often a feeling by parents in such proceedings that they are in effect being charged with fault or neglect. Such is not the case. This state recognizes that children are not property of their parents whose control may only be interrupted by a finding of fault; on the contrary, Arizona recognizes that children as persons have special needs and rights which are protected by law. One of those rights is the right to effective and proper parental control and care. If a child is found to be without

such parental care and control and without parents willing or capable of exercising such care and control, the child is a dependent child entitled to have such care and control furnished through the state.

At the hearing, the testimony of the parents disclosed a stormy relationship which eventually culminated in divorce in 1972. The bitterness continued between the parties even after the divorce, and the arguments were accompanied by threats by the father upon the life of the mother. The mother testified that some three weeks before the hearing her ex-husband had threatened her life. The father, however, testified that in his opinion the children were well looked after by the mother. This position was supported by the testimony of a neighbor. The mother testified that she felt that her previous emotional problems were under control so she could take care of the children. She felt that the harassment by her husband was over.

On the other hand, the mother's psychiatrist testified concerning her emotional condition and her need for continued professional help. The social worker from the Department of Economic Security testified concerning her observations as to the conduct and condition of the children and her contacts and interviews with the mother.

Counsel for the mother argued that conditions had changed from the earlier crisis period, and he contended that the mother was capable of discharging her duties as a proper and effective parent. The trial court did not accept the arguments of counsel for appellant, and that court concluded the conditions shown by the hearing justified a finding of dependency.

Counsel for the mother argues that there was not sufficient competent evidence upon which the trial court could base a dependency finding.

█ Generally, the decision of the trial court as to the weight and effect of evidence will not be disturbed unless it is clearly erroneous. O'Hern v. Bowling, 109 Ariz. 90, 505 P.2d 550 (1973). All reasonable inferences must be taken in favor of supporting the findings of the trial court, and if there is any evidence to support the judgment, it must be affirmed. Jerger v. Rubin, 106 Ariz. 114, 471 P.2d 726 (1970).

█ The evidence at the hearing concerning the home situation, parental strife, and emotional condition of the mother were sufficient to justify the finding of dependency.

The present case presents a more difficult problem. A review of the evidence at the hearing, excluding the alleged inadmissible material, discloses a situation which would justify a finding that the children are dependent under A.R.S. § 8–201(10). There was also introduced into the hearing material from a report from a child guidance center. That report applied to only one of the three children. The trial court, pursuant to the authority granted by A.R.S. § 8–241A(1), awarded the two younger children to the care of their mother subject to the supervision of the Department of Economic Security, but the oldest child was awarded to the Department of Economic Security for placement in foster care.

The nature of the disposition made by the trial court compels the conclusion that he considered the matters presented in the report. There is nothing else in the record which seems sufficiently to distinguish the condition of the children save and except the matters in the report. This Court is squarely faced with the issue of whether the trial judge could properly consider the information found in the report.

Rule 16(a), Rules of Procedure for the Juvenile Court, 17A A.R.S., provides:

"Prior to a hearing of a neglect or dependency action, the court may examine the social records of any person or agency with reference to the child and make the same available to all interested parties and their counsel prior to the hearing."

Subsection (e) of the same rule provides:

"The conduct of the hearing shall be as informal as the requirements of due process and fairness permit and shall proceed generally in a manner similar to the trial of a civil action before the court sitting without a jury. After the hearing, the court shall state its findings by minute entry or written order. If the court finds that the allegations are sustained by the evidence, the court may proceed with the disposition of the case. If the evidence does not sustain the allegations, the court shall dismiss the petition."

It is the contention of counsel for the mother that the report is just plain hearsay, and if the state wished to have the court consider the matter they should have called the witnesses who made the report.

This Court, in adopting Rule 16(a), sanctioned a practice which had long been in use in juvenile court. Reference to the procedure is found in Caruso v. Superior Court, 100 Ariz. 167 at 173, 412 P.2d 463 at 467 (1966). Obviously, by providing that the court could examine the records prior to the hearing, we expected the trial court to make use of the information in such records. The parties to the hearing were to be provided with the same information prior to the hearing. The information was made available to the parties in this case. The position of the trial court on the issue was:

"The Court will receive and consider the report pursuant to, I believe, it's Rule 16 of the Rules of Procedure for the Juvenile Court. You will have the opportunity and in view of your indication that you wish to do so, the Court will make available to you sufficient time, now or in the future, to call as witnesses, adverse witnesses, any of the parties that participated in making this report from Jane Wayland."

While subsection (e) of Rule 16 does not require that the identical rules of evidence

for civil actions be used in dependency proceedings, there must be some sound and compelling reason for departing from such rules, and the procedure must meet the requirements of due process.

Appellant's position is that the report is hearsay and should not have been admitted for any purpose. The guidance center report was hearsay, but this alone does not preclude its use in evidence. Since this is a civil matter we are not involved with Sixth Amendment confrontation problems. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

There is authority for the position that a medical report is admissible even though it is hearsay. In Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) the United States Supreme Court stated:

"Courts have recognized the reliability and probative worth of written medical reports even in formal trials and, while acknowledging their hearsay character, have admitted them as an exception to the hearsay rule." 402 U.S. at 405, 91 S.Ct. at 1429, 28 L.Ed.2d at 854.

For other federal cases allowing admission of medical reports over hearsay objection see Runkle v. United States, 42 F.2d 804 (CA 10, 1930); Long v. United States, 59 F.2d 602 (CA 4, 1932); White v. Zutell, 263 F.2d 613 (CA 2, 1959).

By statute, Colorado has a procedure somewhat similar to our Rule 16(a) of the juvenile court rules. Reports made pursuant to the statute are considered by the trial court in making a decision, and the procedure has been held not to violate due process. Aylor v. Aylor, 173 Colo. 294, 478 P.2d 302 (1970) (reports in divorce actions); In re People in Interest of A.R.S., 31 Colo.App. 268, 502 P.2d 92 (1972) (reports in parental severance action).

The statute urges that the consideration of the report by the trial court was not error because that court gave the appellant

full opportunity to require the authors of the report to appear as witnesses and be subjected to cross-examination. Appellant did not make use of the opportunity. The state claims that appellant may not now complain that the report was improperly considered. We do not accept the position of the state.

The burden of proof in the case was upon the state. The child guidance center report was of such a nature that its admission was very damaging to the position of appellant. By considering the report over the objection of appellant, the trial court shifted the burden to appellant to attack the material in the report. The burden should have been on the state to prove the material in the report in much the same fashion as in a civil trial.

We believe the proper procedure to use in dependency proceedings is for reports submitted under Rule 16(a) of the juvenile rules to be reviewed by the trial court, but if counsel for any party objects to any material in the report being considered by the trial court, such material may not be considered. Any party desiring to have the material in the report considered by the trial court must follow the procedure for admission of evidence in a civil case. This construction, we believe, will harmonize the provisions of subsections (a) and (e) of Rule 16 of the juvenile rule.

There was competent evidence presented to support the judgment of the trial court in finding all three children dependent, and there is competent evidence to support the disposition ordered for the two younger children. The trial court's judgment on these matters is affirmed. Since incompetent evidence was considered in making the disposition of the oldest child that portion of the trial court's judgment is set aside, and the cause is remanded to the superior court for a new hearing on the issue of a proper disposition of the child Michael.

Affirmed in part, reversed in part.

HAYS, J., concurs.

LOCKWOOD, Justice (specifically concurring).

From my review of the evidence in this case, especially the testimony of Miss Perry, I believe the disposition made by the trial court of the two younger children was necessary and in their best interest. The trial judge ordered that the two younger children remain in the custody of their mother but subject to the supervision of the state agency. By this ruling the mother would have the counsel and assistance of the social services of the state to provide proper and effective care and control of the children.

I concur in the disposition of this cause as to the older child for the reasons stated in the principal opinion.

STRUCKMEYER, Vice Chief Justice (concurring and dissenting):

Since it is my belief that the majority have not adequately considered either the law or evidence applicable to this case, I feel compelled to express my views at length. Before doing so, I should state that I concur in the reversal as to the child Michael, but dissent, believing that there should also be a reversal as to the twins, Bobby and Alice.

The principle of admissibility of hearsay reports before administrative agencies was established in this State as early as 1935 in a workmen's compensation case where a claimant had been afforded an opportunity to cross-examine a licensed doctor. Simpkins v. State Banking Department, 45 Ariz. 186, 42 P.2d 47 (1935). But hearsay reports of medical experts have not been approved for trial courts of general jurisdiction in Arizona, and only under rare occasions, as a matter of practical necessity, elsewhere.

In Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), procedural informalities of the kind found in this case were expressly disapproved as adequate for juvenile courts. There, the Su-

preme Court of the United States in reversing Arizona's decision, 99 Ariz. 181, 407 P.2d 760 (1965), said:

"The Arizona Supreme Court held that 'sworn testimony must be required of all witnesses including police officers, probation officers and others who are part of or officially related to the juvenile court structure.' We hold that this is not enough. No reason is suggested or appears for a different rule in respect of sworn testimony in juvenile courts than in adult tribunals. * * *

The recommendations in the Children's Bureau's 'Standards for Juvenile and Family Courts' are in general accord with our conclusions. They state that the testimony should be under oath and that only competent, material and relevant evidence under rules applicable to civil cases should be admitted in evidence. * * *" 387 U.S. 1, 56–57, 87 S.Ct. 1428, 1459, 18 L.Ed.2d 562.

The most superficial examination of the facts in the present case demonstrates the paucity of due process afforded Mrs. Alice King, the mother of the three children involved in this dependency proceeding, and the complete disregard of the United States Supreme Court by the Superior Court of Maricopa County sitting in a juvenile proceeding.

A petition was filed in the Superior Court by Martha Perry, a social worker, asserting that the three children of Alice King were in need of proper parental care and control. The court found that Alice King was indigent and appointed counsel in her behalf. It should be noted that by statute, A.R.S. § 8–225(A), appointed counsel is limited to a fee of $250.00. Such a fee in a serious matter is, in effect, no fee at all, since it cannot possibly compensate a lawyer for trial, trial preparation, and an appeal, if necessary.

At the hearing on the petition, two witnesses were called in behalf of the State. George Weber, M. D., psychiatrist, testified that he had twice met Mrs. King in the month of October, some eight months before, *but that he had never seen her children.* His testimony, insofar as it was significant to the decision in this case, was his interpretation of certain facts and conclusions contained in a combination psychological-staff report made at the Jane Wayland Child Center in Phoenix. It concerned Mrs. King's nine-year-old son, Michael.

The psychological report was signed by two persons, listed respectively as chief and staff psychologists, Ph.D's. It purported to show that certain "diagnostic procedures" (testings) were undertaken, but no copies or results of the tests were attached to the report. Nor were the testing procedures described, nor is there anything in the record to indicate their nature or scientific or medical reliability.

The report also included as "background and observations" certain purported facts whose sources were not disclosed. Among these was a statement, for example, that Michael had been rejected by his father and mother.

The report also included "psychological findings," presumably predicated on the foregoing, as, for example, "the presence of cerebral dysfunction" and "a somewhat confused sexual identity."

The report also included a "summary and recommendations," presumably predicated on the foregoing, stating, for example, that Michael "is beginning to seriously emotionally deteriorate, showing both delusional and schizoid thinking."

The psychological report was examined later by a panel of four staff members of the Jane Wayland Child Center, only one of whom was a consulting psychiatrist, an M. D. Attached to the psychological report is what is denominated a "staff report." The staff report contained certain "diagnostic impressions," conclusions presumably made from an examination of the psychological report. A fifth person, a member of the panel, Martha Perry, was listed as "Protective Services (guest)."

The psychological-staff report was first handed to counsel for Mrs. King at about nine o'clock in the morning on the day of the hearing, just before Dr. Weber took the witness stand as the first witness. The State was examining Dr. Weber when counsel for Mrs. King made this objection:

"Yes, but her [Martha Perry] report is based upon a report I was given just today, about a half hour before this hearing, and that report is from Jane Wayland, which I feel should not be allowed at this hearing unless Dr. Erickson or Louise Mandel or the psychiatric social worker is here so I can cross-examine. I certainly don't think the facts of that report ought to be recited to Dr. Weber for him to make an—either an opinion or to explain it. It's completely hearsay. I don't have a chance to even talk to these people.

THE COURT: The Court will receive and consider the report persuant [sic] to, I believe, its Rule 16 of the Rules of Procedure for the Juvenile Court. You will have the opportunity and in view of you indication that you wish to do so, the Court will make available to you sufficient time, now or in the future, to call as witnesses, adverse witnesses, any of the parties that participated in making this report from Jane Wayland.

The objection is overruled. You may answer the question."

Dr. Weber's testimony at the hearing in its important aspects was predicated 100% on the report. He testified, for example, concerning Michael King:

"What the report says is that he has a specific learning disturbance, secondary to his brain damage, and that he has an anxiety with an identity infusion. He is regressing and he is becoming schizoid and he has cultural deprivation. Now, these terms mean literally that the home life that he has is making him sick."

Dr. Weber's testimony in its important aspects was a repetition of the contents of the report with added interpretations, opinions, and conclusions based upon the hearsay and conclusions set forth in the report.

It cannot be emphasized too strongly the exact nature of the psychological report. There is no indication whatsoever in the record as to who made the psychological testing, the manner of the testing, the results of the testing, whether the tests are accepted or approved scientifically or medically, or whether they might have also shown matters which might be construed as being favorable to Mrs. King. The report was also laced with purportedly factual matters, the sources of which were in no way revealed. It is overwhelmingly apparent that counsel for Mrs. King did not have the opportunity to test the hearsay and conclusions expressed in the reports prior to cross-examination of Dr. Weber or to have an independent evaluation from sources either psychological or medical, lacking which the indigent mother of these children was compelled to accept both the reports and the opinions of Dr. Weber in their entirety.

The hearing in this respect was wholly a one-sided affair and can hardly be considered more than a farce. Mrs. King had been unemployed and her former husband, the father of these children had not been making his support payments. She could have hardly afforded, even if the hearing had been continued, to employ experts to make an independent evaluation of the reports and to testify in her behalf. No provisions are made by law or rule of court to provide a person in Mrs. King's position with the expertize to challenge either Dr. Weber's interpretations or the psychological evaluations expressed in the reports— even assuming the tests were scientifically and medically acceptable and the other purported facts recited therein were proved in the manner customarily required in courts of law and equity.

It is clear that the court shifted the burden of proof by compelling Mrs. King to call witnesses to disprove the facts and

conclusions recited in the reports rather than require the State to establish their truthfulness as a necessary predicate for Dr. Weber's testimony.

This was not an uncontested proceeding concerning a destitute child. This was a case where both the mother and father of the three children challenged the right of the State to deprive the mother of the custody and control of the children. The proceeding did not in any way conform to the Children's Bureau's "Standards for Juvenile and Family Courts" for the evidence received by the court upon which its decision was obviously based was neither under oath nor otherwise competent under the rules applicable to children's court proceedings. Nor did it conform to the mandate of Rule 16(e) of Juvenile Court Rules of Procedure, 17A, A.R.S., that the conduct of the hearing "shall proceed generally in a manner similar to the trial of a civil action before the court sitting without a jury." The proceeding was devoid of any of the attributes customarily ascribed to procedural due process and fairness.

For the foregoing reasons, I concur that this case must be reversed for another hearing as to the child Michael.

I dissent as to a finding of dependency of the other two children. In particular, I dissent to the conclusion of the majority that "The evidence at the hearing concerning the home situation, parental strife, and the emotional condition of the mother were sufficient to justify the finding of dependency." I am appalled not only by the treatment of Mrs. King, but because the sufficiency of the evidence to deprive parents of their children is a matter of concern to all parents of this State.

Alice Faye King was married when she was sixteen. She had twin children, a boy and a girl, of which only Michael survived. Mrs. King and her husband came to Arizona some five years before this dependency proceeding because Michael had asthma and bronchitis, but since being here he had been "perfect." Two other children, twins, were born May 2, 1970. Thereafter, she began having trouble with her husband, which culminated in a divorce.

Mrs. King was living on welfare immediately after the divorce, but she obtained a job and started attending Ruetten Learning Center in the evenings, taking general office work. She arranged for a babysitter when she was not at home. No complaints from any source were made as to Mrs. King's care of her children. This dependency proceeding was initiated because she attracted the attention of the Department of Economic Security by twice requesting assistance in the care of her children. The first time, she left her children for seven days in a children's shelter because she was having trouble with her ex-husband who had made some threats upon her life. The second time, she was in an automobile wreck in which her car was totally destroyed and she had been in the hospital. She was unable to contact her ex-husband because he was in Canada, and she lost her job. Through a mistake, her welfare check was not delivered and she was evicted from her apartment. This time she left her children in foster care for three months.

The father of the children, Robert King, appeared as a witness, testifying that he believed they were well looked after and should be kept with their mother. A neighbor testified that all of the children acted normal and were being well looked after and were not undernourished, nor did the neighbor feel the children were emotionally deprived or neglected.

*There was no testimony at the hearing whatsover that the King children were not properly housed, clothed or fed, or that they were brutalized, running the streets at large or in danger of becoming delinquents.*

As stated, the social worker, Martha Perry, working for the Protective Services of the State Department of Economic Se-

curity, initiated the dependency proceeding. A.R.S. § 8–201, subsec. 10(a), provides:

"10. 'Dependent child' means a child who is adjudicated to be:

(a) In need of proper and effective parental care and control and has no parent or guardian, or one who has no parent or guardian willing to exercise or capable of exercising such care and control."

The foregoing statute insofar as it relates to this case simply says that a dependent child is a child who has no parent willing or capable of exercising proper and effective parental care and control. The words "proper and effective" provide only the most nebulous of guidelines. Obviously their meaning will shift from judge to judge and case to case. Equally obvious, the statute would be unconstitutional for vagueness were it not interpreted in the light of those commonly understood rights of parents prior to its adoption in 1970. *See* Laws of 1970, Ch. 223, § 2.

At the common law of England, a parent's right to custody and control of minor children was a sacred right with which courts would not interfere except where by conduct the parent abdicated or forfeited that right. In re Hudson, 13 Wash.2d 673, 126 P.2d 765 (1942). It has been aptly stated that juvenile courts have not been so far socialized and individual rights so far diminished that a child may be taken from its parents simply because some courts might think that to be in the best interest of the state. In re Coyle, 122 Ind.App. 217, 101 N.E.2d 192 (1951). Commonly it is said that as long as parents exercise their duty under their natural right to rear, educate and control their children, the fact that some other person or organization might be better suited to do so will not justify a juvenile court in separating the children from the parents. *See, e.g.,* Bryant v. Brown, 151 Miss. 398, 118 So. 184, 60 A.L.R. 1325 (1928).

This Court in Arizona State Department of Public Welfare v. Barlow, 80 Ariz. 249, 296 P.2d 298 (1956), said that no court for any but the gravest of reasons can transfer a child from its natural parents to any other person. We held:

"Because the child has attained a favored, beneficent status in our social and legal systems does not detract from the well-settled rule that the right of parents to the custody of minor children is both a natural and a legal right. Harper v. Tipple, 21 Ariz. 41, 184 P. 1005, In re Winn, 48 Ariz. 529, 63 P.2d 198. While the right to custody is not absolute because the parent may be deprived thereof by the state in the best interest and welfare of the child, Dickason v. Sturdavan, 50 Ariz. 382, 72 P.2d 584; Fladung v. Sanford, 51 Ariz. 211, 75 P.2d 685, we are compelled to agree with the Court of Appeals of New York that 'no court can, for any but the gravest reasons, transfer a child from its natural parent to any other person'. People ex rel. Portnoy v. Strasser, 303 N.Y. 539, 104 N.E.2d 895, 896." 80 Ariz. at 252, 296 P.2d at 300.

Arizona's statute is so similar in language to California's that it must be concluded that it was adopted from that state. Section 600, subdivision (a) of California's Welfare and Institutions Code provides that the juvenile court may adjudge a person under the age of 18 years to be a dependent child:

"(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control. * * *"

California has previously interpreted its statute at length in In re Raya, 255 Cal. App.2d 260, 63 Cal.Rptr. 252 (1967), in a case in which it was shown that the mother was living with a man to whom she was not married. The court in construing the California act said:

"The phrase 'proper and effective' offers at best a dim light to discern the point at which a juvenile court is authorized to

invade and supplant a parent-child relationship.

\* \* \* \* \* \*

Although expressed more often in divorce and guardianship cases, the dominating right of a parent to custody of his child plays a role in the interpretation of section 600, subdivision (a). Many homes, however blessed by marital vows, fall short of an ideal environment for children. It may be safely assumed that the Juvenile Court Law was not intended to expose such homes to wholesale intervention by public authorities. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' (Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, quoted in Roche v. Roche, supra, 25 Cal.2d 141 at p. 144, 152 P.2d 999.) Thus before section 600, subdivision (a), authorizes the drastic step of judicial intervention, some threshold level of deficiency is demanded. Although a home environment may appear deficient when measured by dominant socioeconomic standards, interposition by the powerful arm of the public authorities may lead to worse alternatives. A juvenile court may possess no magic wand to create a replacement for a home which falls short of ideal. California appellate decisions in wardship cases of the 'dependent child' variety demonstrate rather extreme cases of neglect, cruelty or continuing exposure to immorality. (See In re Farley, supra, 162 Cal.App.2d 474, 328 P.2d 230; In re Schubert, 153 Cal.App.2d 138, 313 P.2d 968; In re Corrigan, supra, 134 Cal.App.2d 751, 286 P.2d 32; Marr v. Superior Court, supra, 114 Cal.App.2d 527, 250 P.2d 739; In re Halamuda, 85 Cal.App.2d 219, 192 P.2d 781; In re Schultz, 99 Cal.App. 134, 277 P. 1049; Ex parte Hunter, 45 Cal.App. 505, 188 P. 63.)

When section 600, subdivision (a), is so viewed, the present facts fall far short of that level of improper and ineffective control which might justify an adjudication of public wardship." 255 Cal. App.2d at 264–266, 63 Cal.Rptr. at 255–256.

So in the present case, the facts fall far short of that level of improper and ineffective control which might justify an adjudication of dependency. Nor is there the slightest semblance of a grave reason to transfer these children from their natural mother. Arizona State Department of Public Welfare v. Barlow, supra.

As stated, the Department of Economic Security called only two witnesses to prove that the King children had no parent who was capable of exercising effective care and control. The first was Dr. George Weber. In addition to the testimony that he had seen Alice King in a professional capacity twice in October of 1972, some eight months before, and had not seen her since, he was asked the question whether he found that Mrs. King had emotional problems. He answered, yes, stating:

"I felt that it was in the nature of a neurosis, rather than a psychosis anxiety reaction, immature personality reaction."

He testified that Mrs. King:

" \* \* \* appeared to be correctly oriented and appeared to think rationally about her situation. She just appeared to be almost beyond the brink of doing anything about it herself at that time and was asking for help."

This testimony was Dr. Weber's observation about Mrs. King shortly after her divorce and while she was still unemployed, some eight or nine months before the hearing.

In response to the question:

"Would it be fair to say she was emotionally upset with her relationship with her husband?"

he answered:

"Very definitely, but this had sort of begun to spread out, and this is what was

bothering her. She was beginning to feel inadequate to care for the children. That, we felt, was a temporary thing at that time, at least."

Dr. Weber also testified in what is an obvious conclusion from hearsay that while he had not seen her since the previous October, he had access to the records of the people who had seen her at the clinic and "basically the personality problems haven't changed."

The only other witness for the State was Martha Perry, who initiated the dependency proceeding in the Juvenile Court. She graduated with a master's degree at Wayne State University and commenced working for the Welfare Department in August thereafter.

She testified that she first contacted Mrs. King on August third or fourth of 1972. In response to the question, "At your initial visit, what did you observe about Mrs. King and her children", she answered:

"* * * I saw Mrs. King and the twins, and Mrs. King appeared to be quite tense."

She made three visits in August, and:

"* * * Mrs. King appeared to be quite tense, and she was a little agitated, was kind of jerking the children around a little bit and trying to get them to eat, and this sort of thing."

At the time Mrs. King placed her children in the shelter for seven days, Miss Perry testified that Mrs. King told her:

"* * * Mr. King had not been paying the child support; that her money had been stolen; I believe her glasses had been stolen; she had had numerous problems which had piled up on her at the time, * * *."

On December 4, 1972, as stated, Mrs. King voluntarily placed the three children under foster care for three months. After the twins returned home, Miss Perry visited Mrs. King in May of 1973, that is, one month *after* she initiated her petition for declaration of dependency with the Juvenile Court. About this visit she testified:

"Well, at that time there was again tension in the home. The twins—I don't know the reason for this, but the twins did appear to be upset, and she was tense and the twins seemed to be reflecting this tension; and she told me at the time that little Bobby was not toilet trained; that Alice was, that little Bobby was apparently regressing, and she was having some difficulty with this toilet training. So *all I can say* is they appeared to be quite tense at the time, and did not respond to me as they had when I visited them in the foster home." (Emphasis supplied)

Miss Perry testified in corroboration of both the neighbor and the father:

"Q. As far as Mrs. King feeding and clothing her children, what is your opinion as far as that is concerned?

A. It appears that she has actually, you know, given them the environmental needs, the food and the clothing, as best that she could do.

Q. How about living?

A. Under the circumstances, sir—

Q. How about her living quarters?

A. I think—I think her living quarters were adequate since she was dependent primarily upon welfare. I think she rented as nice an apartment as she could of her limited financial circumstances."

In In re Larry and Scott H———., 92 Ohio L.Abst. 436, 192 N.E.2d 683 (1963), the juvenile court, under an Ohio statute which provided that a dependent child included any child "who lacks proper care or support by reason of the mental or physical condition of his parents, guardian, or custodian; * * *," had this to say:

"Are the children dependent in that they lack proper care because of the mental condition of the mother? The mother has never been adjudged mentally incompetent and we do not suggest that such a proceeding is a necessary

prerequisite to a finding of dependency under (B) above. However, it would seem that at least the same degree of proof would be necessary to prove mental incapacity to care for children as would · be necessary to prove mental illness or deficiency. Moreover, under this dependency provision, it would appear to be necessary for the petitioner to produce not only evidence of the mother's mental incapacity, *but also evidence showing that the children lacked 'proper care' because of the mental incapacity.* Here the evidence of lack of proper care is meager almost to the point of being non-existent." 24 Ohio L.Abst. at 440–441, 192 N.E.2d at 686. (Emphasis supplied)

In the case at bar there is neither proof of Mrs. King's mental inability to care for her children, nor is there any evidence at all that, in fact, her children lacked proper care. There has not, in the language of the California decision of In re Raya, supra, been demonstrated a case of neglect, cruelty or continuing exposure to immorality. Nor in the language of this Court's decision in *Barlow*, supra, is there a grave reason to transfer the custody from the natural mother.

The majority have by their decision supplanted the natural right of parents to the care and custody of their children with an unbridled, arbitrary social intermeddling. I dissent.

CAMERON, Chief Justice (concurring).

I concur in the concurrence and dissent of Vice Chief Justice STRUCKMEYER.