804 P.2d 827

**In the Matter of the APPEAL IN SANTA CRUZ COUNTY JUVENILE DEPENDENCY ACTION NOS. JD–89–006 AND JD–89–007.**

**Nos. 2 CA–JV 90–0022, 2 CA–JV 90–0023.**

Court of Appeals of Arizona, Division 2, Department A.

Oct. 25, 1990.

Review Denied Feb. 5, 1991.

The Law Offices of James F. Haythorne-white by Gregory L. Droeger, Nogales, for parents.

William Rothstein, Nogales, for minors.

Robert K. Corbin, Atty. Gen. by Jay W. McEwen, Tucson, for State.

## OPINION

HATHAWAY, Judge.

This appeal was taken from the order of the juvenile court adjudicating the minors dependent and placing them in the custody of the Department of Economic Security (DES). On appeal, the parents contend that they were denied due process by the absence of any cross-examination of the children. As part of this argument, they contend that counsel was ineffective in either failing to object to or acquiescing in interviews of the children by the court out of the presence of counsel and the parties. The parents also contend that the dependency statute is unconstitutionally vague. We affirm.

The two minors are stepbrothers, now 14 years old. "E." is the son of the father, and "J." is the son of the mother. The mother and father began their relationship when the boys were five years old and eventually married. The four lived together in a canyon approximately 15 miles outside of Patagonia. The terrain is rugged, and the house can be reached only by four-wheel-drive vehicles. The boys were educated at home and were required to work with their parents on the property. The father is confined to a wheelchair as a result of a car accident.

In 1985, when the boys were nine, they set fire to their bedroom, apparently in anger at their parents. They then ran away to Patagonia, where they told DES workers that they had been beaten with rubber hoses and fan belts. The parents agreed to a 90–day voluntary placement; J. went to a foster home and E. lived with his mother in Tucson. Both boys eventually returned to their parents. In October of 1986, the boys again ran away but were returned to their parents when a DES caseworker concluded that the boys simply wanted to come to town to participate in trick-or-treating on Halloween.

During the spring of 1989, while the parents were away overnight, the boys took a rifle and shot up the property, causing extensive damage. In May, two months after the incident, J. again ran away to Patagonia, claiming that he had been beaten by his parents. The parents voluntarily placed him in foster care for 90 days. In August, E. also ran away, and when contacted by DES the parents stated that they were not ready to have the children returned to them. DES then filed a dependency petition.

Five days of hearings were conducted between December 1989 and February 1990. Testimony was presented by the caseworker, an evaluating psychologist and, as to E., a psychiatrist. As to J., the witnesses testified that he had a normal IQ, gave no evidence of psychological disorder, and that his academic progress was in general appropriate for his age. He had adjusted well to his foster home and was happy to be attending public school. The psychologist testified, however, that he was "socially retarded," probably as a result of his isolated environment. She further testified that J. reported that he received punishments which were disproportionate to the reported offenses and that he was extremely fearful of returning to his home. The psychologist recommended that he not be returned to his parents until they had been evaluated and the family had received therapy, fearing that the deterioration in the relationship between J. and his stepfather could result in violence by either against the other.

E. was initially placed in foster care, but then referred to a psychiatric hospital for evaluation after he became destructive and violent toward others and exhibited bizarre behavior. He was diagnosed as emotionally disturbed, resulting in part from previously suspected but unconfirmed cerebral palsy, as well as from his isolated environment and his relationship with his parents. He was ultimately placed in a group home with a very structured environment and

stated that he did not want to return to his parents' home. The psychiatrist recommended against his return to the parents until E. was ready and until the family received therapy.

Both parents testified and admitted that the children had on occasions been "whipped" with a rubber hose but denied that the children had been abused. They also admitted that E. was a difficult child, but testified that he had functioned well and happily under their system of discipline. Both essentially viewed the problems as stemming from the boys' challenge to their parental authority, compounded by what they viewed as interference by the DES caseworker, the psychiatrist and the psychologist which further undermined their authority in the eyes of the children. The children did not testify in court, but were interviewed by the judge three times in chambers.

At the conclusion of the hearings, the juvenile court issued the following under-advisement order:

A dependent child is legally defined as a child whose parents are not willing or are not capable of exercising proper control and care for a child.

It is evident to this Court that [the parents] are willing to care for their children, however because of the obvious breakdown in the relationship between the parents and these children, this Court concludes that the parents are not able to care for these children at this point in time.

The Court is thoroughly satisfied that if the children were to be returned to their parents under the existing family interrelationship, the children would again run away from home and be subject to danger.

It appears evident to this Court that these children have lost respect for their parents due to the inability of the parents and children to establish a healthy relationship with each other.

Because of the foregoing factors, this Court determines that the children are determined to be dependent children.

This Court has carefully considered the possib[i]lity of placing the children back in their home, but due to the familial breakdown, that would not be in the best interests of the children.

Any reasonable efforts to place the children back in the home would clearly prove disastrous for the children and the parents.

The children are declared dependent and legal and physical custody of these children is placed with the D.E.S. until further order of this Court.

The D.E.S. will make all reasonable efforts to reunite the family and will report their efforts to this Court every ninety days.

[The parents] must receive a psychological evaluation and attend counseling sessions to help them understand why the family may have become complet[e]ly dysfunctional.

 The first issue raised by the parents concerns their inability to cross-examine the children. We note initially that neither child was called as a witness by the parents, although this possibility was discussed by counsel. On the first day of the hearings, the attorney general advised the court that the children had been brought to the court and stated "I'd like to have the Court—and I think we've all agreed—that you would be able to talk to them in chambers at some point today. I'd like to get them on." Counsel for the parents responded: "Likewise, Judge my clients indicate to me at this point that they would like for possibly the children to be called as witnesses. I don't anticipate that will be able to be done today because of the time constraints." The children were apparently interviewed by the judge in chambers with no one else present on that date.

On the third day of the hearings, January 11, 1990, the children were again brought to court to speak with the judge. The following transpired:

MR. McEWEN: We have the boys here. I don't know, you indicated you might want to talk to them and the group home staff, whether you would want to talk to them now, whether she keep them around all day.

MS. SMITH–FLOREZ: It's up to you, Judge.

THE COURT: I don't really want to keep them around here all day why don't we recess at 11:30 and I'll speak with them at 11:30.

MS. SMITH–FLOREZ: Fine.

At 11:30, the judge interrupted the proceedings to interview the children with no objection from the parents. On January 30, the issue of the children's testimony was again raised. Counsel indicated to the court that she and her clients needed "to rediscuss whether or not they really feel that after the Court having spoken with [E.] and [J.] in chambers that they want to insist that they testify." At the conclusion of that day's hearing, the issue was again raised and the attorney general indicated that he "ha[d] a problem with having the children testify. I thought we stipulated that the Court could talk to them in chambers and I have no problem with that but having them testify I do have a problem." The issue was deferred to the final day of the hearings, but not raised again. The children were never called to testify and at the conclusion of the hearings, the judge again interviewed the children without objection.

Given the above, we believe it is clear that any objection to the in-chambers interviews was waived by both counsel and the parents. The right to cross-examine the children was never refused, and therefore no due process right was violated, because the opportunity to exercise that right was never requested. *See Maricopa County Juvenile Action No. JD–561*, 131 Ariz. 25, 638 P.2d 692 (1981). No objection was raised to the procedure followed by the court, nor were the children ever called as witnesses. Under these circumstances, we can find no violation of due process.

■ The parents also contend that counsel was ineffective in failing to call the children as witnesses or otherwise insist on the right to cross-examination. Assuming, without deciding, that this issue is properly raised in the context of a dependency pro-

ceeding, we find no basis for reversal. Nothing in the record indicates the basis for counsel's actions.[1] However, the record does indicate that the question was carefully considered by counsel and discussed with her clients. Counsel may well have concluded that the pressure of cross-examination might serve only to reinforce the children's adamant conclusion, repeatedly expressed to others, that they were afraid of their father and did not want to return home.

Further, the hearings were clearly moving away from the issue of physical abuse to the issue of the emotional relationship of the parties and the special needs of E. as a result of his cerebral palsy and emotional disorders. Indeed, the juvenile court made no findings as to physical abuse but rather emphasized the general breakdown of the parent-child relationship. In this regard, the parents have offered no facts as to which the children could have testified, other than their repeated assertion that their authority with the children was undermined by the caseworker and that the allegations of abuse were unsubstantiated. However, as the psychologist and psychiatrist testified, even if the children's stories of their treatment were fabrications or exaggerations, the fact remained that the children were afraid of their parents, that they did not want to live with them and that the parent-child relationship had broken down. The parents did not dispute this, and under these circumstances trial counsel may well have concluded that the children's testimony would not have served her clients' position. Given counsel's performance as a whole, we cannot find that the parents were denied the effective assistance of counsel as a result of her decision not to call the children to testify.

■ The parents also argue that the dependency statute is unconstitutionally vague. A.R.S. § 8–201(11)(a) and (b), the statute relied upon in the petition, defines a dependent child as one who is adjudicated to be:

(a) In need of proper and effective parental care and control and has no parent

---

1. The parents have attached affidavits to their supplemental brief stating that they insisted that counsel call the children as witnesses. These affidavits are not properly before this court and have therefore not been considered.

or guardian, or one who has no parent or guardian willing to exercise or capable of exercising such care and control.

(b) Destitute or who is not provided with the necessities of life, including adequate food, clothing, shelter or medical care, or whose home is unfit for him by reason of abuse, neglect, cruelty or depravity by either of his parents, his guardian, or other person having his custody or care.

The parents argue that the statute fails to provide adequate warning as to what conduct is prohibited, fails to provide guidance to the courts and law enforcement agencies and thus confers impermissible discretion upon them, and results in a "chilling effect" on the parents' "constitutionally protected behavior." We believe this argument is misplaced.

As our supreme court has recognized, an adjudication of dependency does not require a finding of fault on the part of the parents. *Maricopa County, Juvenile Action No. J-75482*, 111 Ariz. 588, 536 P.2d 197 (1975). Indeed, in this case, the juvenile court made no finding of abuse or neglect or other "fault" of the parents, but rather relied on the "breakdown" of the family relationship in concluding that the children were dependent because the parents were not able to provide the requisite care and control. A.R.S. § 8-201(11)(a). Upholding a similar statute against a charge of vagueness, the Oklahoma Supreme Court noted:

This provision does not proscribe any parental conduct or omission but is concerned only with the welfare of children and whether or not their essential needs are being met....

\* \* \* \* \* \*

In a strict dependency action such as this ... the only inquiry is whether a child is in need of care which for any reason is not being provided.

*Matter of Daniel, Deborah and Leslie H.*, 591 P.2d 1175, 1177 (Okla.1979). Thus the focus of this portion of the statute is not on the conduct of the parents but rather the status of the child. Further, the definition of a dependent child as one "[i]n need of

proper and effective parental care and control and has no parent ... capable of exercising such care and control" utilizes commonly understood terms which give clear notice of the standard to be applied in the adjudication proceeding. We find no constitutional infirmity in the language of the statute.

The undisputed evidence in this case was that on two occasions, once in 1985 and again in 1989, the children had run away from the parents following episodes of violent, destructive behavior by the children. The father himself testified that during that five-year period the relationship had gradually deteriorated to the point where it could be fairly inferred that the parents could no longer control the children. The psychologist testified that the children were afraid of the parents and that, if they were returned to their home with the conflicts unresolved, there was a great potential for violence—either parent to child or child to parent. The record contains substantial evidence in support of the court's finding of dependency, and we therefore affirm.

LIVERMORE, P.J., and LACAGNINA, J., concur.