NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ASHLEY H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, A.L., R.H., *Appellees*.

No. 1 CA-JV 15-0204
FILED 12-15-2015

Appeal from the Superior Court in Mohave County
No. S8015JD201400084
The Honorable Richard Weiss, Judge

**AFFIRMED**

COUNSEL

Erika A. Arlington, Esq., PC, Flagstaff
By Erika A. Arlington
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Laura J. Huff
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Donn Kessler delivered the decision of the Court, in which Judge Andrew W. Gould and Judge Patricia K. Norris joined.

---

**K E S S L E R**, Judge:

¶1   Ashley H. ("Mother") appeals the juvenile court's order adjudicating her children dependent. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶2   Mother is the biological parent of AL and RH. AL was born prematurely in July 2012 in Nebraska, and required regular breathing treatments. The hospital found Mother's lack of interest and attentiveness to be a concern, and set up home health services to follow after AL's discharge. Although the in-home nurse's appointment at the home was scheduled for 9:00 in the morning, Mother did not come out until 9:50, and other household members reported that Mother was hungover. The nurse reported that "the house was covered with beer bottles and full of ashtrays and cigarette butts." AL had been fed; however, she had not received her morning nebulizer treatment and was wheezing. Mother took AL and moved to Kingman, Arizona while the case in Nebraska was still open and pending.

¶3   Medical providers explained to Mother their concern regarding her ability to carry a child to full term. Despite her known potential for premature birth, pregnancy complications, and AL's health issues, Mother smoked a pack of cigarettes a day throughout her pregnancy with RH. Mother testified that she was directed not to quit smoking cold turkey as it could lead to a miscarriage, and she only smoked a half a pack a week. As anticipated, Mother began having difficulties with her pregnancy, and she left AL with her parents (the "Grandparents") beginning in May 2014. Mother failed to provide the Grandparents with financial support or legal authority to meet AL's needs.

¶4        RH was born significantly premature at twenty-six weeks gestation in June 2014. Because of severe health issues,[1] RH had to be transported to St. Joseph's Hospital in Phoenix. Mother stayed at the Ronald McDonald House near the hospital but was evicted when a staff member found drugs and drug paraphernalia in her room.[2] At first, Mother claimed the drugs belonged to a friend, but later claimed the substance was her blood clot medication. Mother participated in a drug test which came back negative.

¶5        The hospital reported concerns that Mother did not acknowledge or understand the severity of RH's condition, did not engage in training for his care, and visited infrequently. When she was present, Mother often talked or texted on her cell phone instead of interacting with RH; and despite instructions to the contrary, when Mother did interact with RH, failed to wash and sanitize her hands after handing her phone. This behavior was consistent with the concerns reported by the hospital in Nebraska when AL was born.

¶6        In September 2014, DCS took temporary custody of AL and placed her with the Grandparents, with whom she had already been residing. Soon after, DCS filed a dependency petition alleging Mother was neglecting AL due to an inability or unwillingness to parent, demonstrated by leaving AL with relatives for months at a time without support or providing the caregivers with the ability to meet AL's needs. DCS further claimed that Mother was unable to provide AL with necessities of life due to a lack of employment and housing, and was neglecting AL due to substance abuse.

---

[1] RH was diagnosed with numerous health issues including anemia, chronic lung disease, feeding problems, hydrocephalus, hydronephrosis, hyperbilirubinemia, intraventricular hemorrhaging, persistent pulmonary hypertension, and respiratory distress syndrome. At the time of the dependency hearing, RH had a shunt for brain bleeds, suspected cerebral palsy, a significant ongoing seizure disorder, and major gastrointestinal issues that required a continuous feeding port. Doctors further believed he would likely have Robinow syndrome and dwarfism, and his last major seizure had possibly left him blind.

[2] The manager at the Ronald McDonald House found a mirror with a crushed up white substance and rolled up dollar bill in her room. The identity of the drug is unknown as tests were never performed on the substance.

¶7        DCS created a case plan and identified several reunification services to be offered to Mother including substance abuse assessment, urinalysis testing, parent aide services, a psychological evaluation, a psychiatric evaluation, counseling services, and parenting classes.   Mother refused to participate in substance abuse treatment or parenting classes, and she declined DCS's offer to help her with transportation to visit RH at the hospital.  Furthermore, although Mother had unlimited evening access to AL and scheduled visitation on Saturdays, she spent approximately an hour a week with her.  Mother claimed her visitation was limited due to her job with Walmart, which she later quit after problems arose stemming from taking time off.

¶8        RH was released from the hospital in September 2014. Because RH was a high-needs baby, he required stable housing free from bacteria and germs[3] and a caregiver trained to monitor his oxygen, feeding tube, and shunt.  Because of concerns regarding Mother's ability to care for RH, DCS took temporary custody of RH and placed him with a licensed foster family trained to care for medically fragile children.   Consequently, DCS filed a supplemental dependency petition alleging RH was dependent based on Mother's inability to provide basic necessities including housing or financial support, as well as neglect based on her failure to learn to care for RH's medical needs.

¶9        In December 2014, Mother participated in a psychological evaluation with Dr. Mark Harvancik.  Dr. Harvancik diagnosed Mother with an anxiety disorder, not otherwise specified; a mood disorder, not otherwise specified; narcissism; antisocial traits; a high addiction potential; and an indication of intermittent explosive disorder.  He opined that these diagnoses would pose significant impediments to parenting, causing problems in attending to daily and basic needs for both herself and her children:  "Untreated anxiety symptoms, mood instability, and anger/rage problems, along with intra- and interpersonal difficulties dating back to family of origin experiences, reflected factors and patterns that have impacted and could continue to interfere with [Mother's] ability to provide adequate parenting."  He further opined that without treatment, Mother's conditions would likely continue for a prolonged, indeterminate period of time, and recommended that Mother "participate in intensive individual therapy to address the above symptoms, patterns and likely unresolved issues, and the associated ramifications for her role as a parent."  He further

---

[3] RH could not be taken out in public due to respiratory concerns and the possibility of catching a cold, flu, or respiratory syncytial virus, any of which could be life threatening to him.

noted that to care for and meet the needs of her children, she would need to find safe, suitable housing, demonstrate appropriate parenting skills, and demonstrate an understanding of RH's special needs.

**¶10**      After a two-day trial, the juvenile court found the children to be dependent based on neglect due to an inability, unwillingness, or refusal to parent or provide necessities of life. Mother timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 8-235(A) (2014), 12-120.21(A)(1) (2003), and 12-2101(A)(1) (Supp. 2015).

## DISCUSSION

**¶11**      Mother argues there was insufficient evidence to find either child dependent. "On review of an adjudication of dependency, we view the evidence in the light most favorable to sustaining the juvenile court's findings. We generally will not disturb a dependency adjudication unless no reasonable evidence supports it." *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005); *see also In re Maricopa Cty. Juv. Action No. J-75482*, 111 Ariz. 588, 591 (1975) ("Generally, the decision of the trial court as to the weight and effect of evidence will not be disturbed unless it is clearly erroneous. All reasonable inferences must be taken in favor of supporting the findings of the trial court, and if there is any evidence to support the judgment, it must be affirmed." (citation omitted)).

**¶12**      "A parent has a constitutional right to raise his or her child without governmental intervention. The government may not interfere with that fundamental right unless a court finds that: (1) the parent is unable to parent the child for any reason defined by statute; and (2) the parent has been afforded due process." *Carolina H. v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 569, 571, ¶ 6 (App. 2013). For a child to be found dependent, DCS must prove one of the grounds found in A.R.S. § 8-201(14)(a) (Supp. 2015) by a preponderance of the evidence, including, for example, that the child's home is unfit by reason of neglect or that the child is not provided with the necessities of life. A.R.S. §§ 8-201(14)(a)(ii)-(iii), -844(C)(1) (2014). Neglect includes "[t]he inability or unwillingness of a parent . . . to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare . . . ." A.R.S. § 8-201(24)(a). Because "[t]he primary consideration in a dependency case is always the best interest of the child . . . the juvenile court is vested 'with a great deal of discretion.'" *Ariz. Dep't of Econ. Sec. v. Superior Court*, 178 Ariz. 236, 239 (App. 1994) (internal citation omitted) (quoting *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160-61 (1982)).

¶13 After reviewing the record, we find sufficient evidence to support the juvenile court's dependency determination, including its finding that Mother was unable to provide the children with the basic necessities of life. First, there is evidence to support the finding that Mother had been unable to provide the children with stable housing. DCS case investigators testified that Mother reported being kicked out of the house she was living in the week before trial, she was directed to a local shelter, and her current living situation was unknown. Although Mother testified at trial that she had found and was currently living with three roommates in a home suitable for the children, she also testified that she was waiting for a referral for long-term housing, and she had not reported her current residence to DCS because it was only "temporary." There was also testimony that, because of his condition, RH needed clean housing with limited individuals in the home, and that Mother did not seem to understand the steps she would need to take to provide him housing that would not be detrimental to his health. In addition to unstable housing, Mother was also unemployed, and a case manager testified that Mother had been unable to provide for AL on even a partial basis.

¶14 There is also evidence in the record to support a finding that Mother had neglected the children. Mother left AL with the Grandparents beginning in May 2014, and failed to provide them with financial support or legal authority to meet AL's needs. Prior to DCS's involvement, the Grandparents lacked a power of attorney and were unable to take AL to the doctor to obtain the services she needed, including immunizations. Mother testified that she had an incomplete power of attorney at her house, and had filled out HIPAA paperwork with AL's doctor stating that Mother's sister-in-law and stepmother had permission to take AL to appointments. This paperwork, however, was not provided to the juvenile court. In addition, although Mother was offered visitation, she participated sporadically and canceled or rescheduled fifty to seventy-five percent of the visits.

¶15 Although as discussed, RH was born with numerous medical conditions, *see supra* ¶ 4 n.1, during his initial hospitalization, Mother did not appear to acknowledge or understand the severity of RH's condition, did not engage in training for his care, and visited infrequently. When she was present, Mother often talked or texted on her cell phone instead of interacting with RH; and despite instructions to the contrary, when Mother did interact with RH, failed to wash and sanitize her hands after handing her phone. Furthermore, although Mother argues she was not provided necessary services for his care, DCS testified that the hospital staff provides training for high-needs children prior to releasing them to their parents,

DCS was not solely responsible for educating Mother as to RH's condition, Mother was responsible in part for educating herself, and Mother could have received further instructions at RH's doctor's appointments. Finally, DCS also testified that Mother did not display the initiative they had hoped for, she did not understand the significance of RH's illnesses, and she failed to follow-up on the training offered by the hospital. Based on this record, we cannot say the trial court erred in adjudicating the children dependent.

## CONCLUSION

¶16 For the foregoing reasons, we affirm the juvenile court's order adjudicating the children dependent.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama